## Case No. 4,479.

### The EMULOUS.

[1 Gall. 563.][1]

Circuit Court, D. Massachusetts. Oct. Term, 1813.[2]

G. Blake, for United States.

William Prescott and William Sullivan, for claimant.

STORY, Circuit Justice. This is a prize allegation, filed by the district attorney in behalf of the United States and of John Delano,

[1] [Reported by John Gallison, Esq.]

[2] [Reversed in Brown v. U. S., 8 Cranch (12 U. S.) 110.]

against five hundred and fifty tons of pine timber, part of the cargo of the American ship Emulous, which was seized as enemies' property about the 5th day of April, 1813, after the same had been discharged from said ship, and while afloat in a creek or dock at New Bedford, where the tide ebbs and flows. From the evidence in this case, it appears that the ship Emulous is owned by the said John Delano, John Johnston, Levi Jenny, and Joshua Delano, of New Bedford, and citizens of the United States. On the 3d day of February, 1812, the owners, by their agents, entered into a charter party with Elijah Brown, as agent of Messrs. Christopher Idle. Brother & Co., and James Brown, of London, merchants, for said ship to proceed from the port of Charleston, S. C. (where the ship then lay) to Savannah, in Georgia, and there take on board a cargo of timber and staves, at a certain freight stipulated in the charter party, and proceed with the same to Plymouth in England, "for orders to unload there, or at any other of his majesty's dock-yards in England." The ship accordingly proceeded to Savannah, took on board the agreed cargo, and was there stopped by the embargo laid by congress on the 4th of April, 1812. On the 25th of the same April, it was agreed between Mr. E. Brown, and the master of the ship, that she should proceed with the cargo to, and lie at New Bedford, without prejudice to the charter party. The ship accordingly proceeded for New Bedford, and arrived there in the latter part of May, 1812, where, it seems, that the cargo was finally (but the particular time is not stated) unloaded by the owners of the ship, the staves put into a ware-house, and the timber into a salt water creek or dock, where it has ever since remained water-borne, under the custody of said John Delano, by whom the subsequent seizure was made for his own benefit and the benefit of the United States. On the 7th of November, 1812, Mr. Elijah Brown, as agent for the British owners (one of whom, James Brown, is his brother), sold the whole cargo to the present claimant, Mr. Armitz Brown (who it would seem is also his brother), for $2,433.67, payable in nine months, for which the claimant gave his note accordingly. The master of the ship, Captain Allen, swears that at the time of entering into the charter party, Mr. Elijah Brown stated to him, that the British owners had contracted with the British government to furnish a large quantity of timber to be delivered in some of his majesty's dock-yards. Besides the claim of Mr. Brown, there is a claim interposed by the owners of the ship Emulous, praying for an allowance to them of their expenses and charges in the premises.

A preliminary exception has been taken to the libel, for a supposed incongruity in blending the rights of the United States, and of the informer, in the manner of a qui tam action at the common law. I do not think this exception is entitled to much consideration.

It is, at most, but an irregularity, which cannot affect the nature of the proceedings, or oust the jurisdiction of this court. If the informer cannot legally take any interest, the United States have still a right, if their title is otherwise well founded, to claim a condemnation. Nor would a proceeding of this nature be deemed a fatal irregularity in courts having jurisdiction of seizures, whose proceedings are governed by much more rigid rules than those of the admiralty. It is a principle clearly settled at the common law, that any person might seize uncustomed goods to the use of himself and the king, and thereupon inform of the seizure: and if, in the exchequer, the informer be not entitled to any part, the whole shall, on such information, be adjudged to the king. For this doctrine we have the authority of Lord Hale (Harg. Law Tracts, 227) and the solemn judgment of the court in Roe v. Roe, Hardr. 185, and Malden v. Bartlett, Parker, 105. And see The Betty Cathcart, 1 C. Rob. Adm. 220. The same rule most undoubtedly exists in the prize court, and as I apprehend is applied with greater latitude. All property captured belongs originally to the crown, and individuals can acquire a title thereto in no other manner, than by grant from the crown. The Elsebe, 5 C. Rob. Adm. 173; 11 East, 619; The Maria Francoise, 6 C. Rob. Adm. 282. This, however, does not preclude the right to seize; on the contrary, it is an indisputable principle in the English prize courts, that a subject may seize hostile property for the use of the crown, wherever it is found; and it rests in the discretion of the crown, whether it will or will not ratify and consummate the seizure by proceeding to condemnation. But to the prize court, it is a matter of pure indifference, whether the seizure proceeded originally from the crown, or has been adopted by it; and whether the crown would take jure coronae, by its transcendent prerogative, or jure admiralitatis, as a power annexed by its grant to the office of lord high admiral. The cases of captures by non-commissioned vessels, by commanders on foreign stations anterior to war, by private individuals in port or on the coasts, and by naval commanders on shore on unauthorized expeditions, are all very strong illustrations of the principle. The Aquila, 1 C. Rob. Adm. 37; The Twee Gesuster, 2 C. Rob. Adm. 284, note; The Rebeckah, 1 C. Rob. Adm. 227; The Gertruyda, 2 C. Rob. Adm. 211; The Melomane, 5 C. Rob. Adm. 41; The Charlotte, Id. 282; The Richmond, Id. 325; The Thorshaven, 1 Edw. Adm. 102; Hale in Harg. Law Tracts, c. 28, p. 245.

And, in cases where private captors seek condemnation to themselves, it is the settled course of the court, on failure of their title, to decree condemnation to the crown or the admiralty, as the circumstances require. The Walsingham Packet, 2 C. Rob. Adm. 77; The Etrusco, 4 C. Rob. Adm. 262, note; and cases cited supra. Nor can I consider these principles of the British courts a departure from the law of nations. The authority of Puffendorf and Vattel is introduced to show, that private subjects are not at liberty to seize the property of enemies without the commission of the sovereign; and if they do, they are considered as pirates: but when attentively considered, it strikes me, that taking the full scope of these authors, they will not be found to support so broad a position. Puff. bk. 8, c. 6, § 21; Vattel, bk. 3, c. 15, §§ 223–227. Vattel himself admits (section 224) that the declaration of war, which enjoins the subjects at large to attack the enemy's subjects, implies a general order, and that to commit hostilities on our enemy without an order from our sovereign, after the war, is not a violation so much of the law of nations, as of the public law applicable to the sovereignty of our own nation. Section 225. And he explicitly states (section 226) that by the law of nations, when once two nations are engaged in war, all the subjects of the one may commit hostilities against those of the other, and do them all the mischief authorized by the state of war. All that he contends for is, that though by the declaration all the subjects in general are ordered to attack the enemy, yet that by custom this is usually restrained to persons acting under commission, and that the general order does not invite the subjects to undertake any offensive expedition, without a commission or particular order (section 227), and that, if they do, they are not usually treated by the enemy in a manner as favorable, as other prisoners of war (section 226). And Vattel (section 227) explicitly declares, that the declaration of war "authorizes indeed and even obliges every subject, of whatever rank, to secure the persons and things belonging to the enemy, when they fall into his hands;" and he then goes on to state cases, in which the authority of the sovereign may be presumed (section 228).

The whole doctrine of Vattel, fairly considered, amounts to no more than this, that the subject is not required, by the mere declaration of war, to originate predatory expeditions against the enemy; that he is not authorized to wage war contrary to the will of his own sovereign, and that, though the ordinary declaration of war imports a general authority to attack the enemy and his property, yet custom has so far restrained its meaning, that it is in general confined to persons acting under the particular or constructive commission of the sovereign. If, therefore, the subject do undertake a predatory expedition, it is an infringement of the public law of his own country, whose sovereignty he thus invades; but it is not a violation of the law of nations, of which the enemy has a right to complain. But if the property of the enemy fall into the hands of a subject, he is bound to secure it. For every purpose applicable to the present case, it does not seem necessary to controvert these positions.

And whatever may be the correctness of the others, I am perfectly satisfied, that the position, is well founded, that no subject can legally commit hostilities, or capture property of an enemy, where either expressly or constructively the sovereign has prohibited it. But suppose he does, I would ask, if the sovereign may not ratify his proceedings, and thus, by a retro-active operation, give validity to them? Of this there seems to me no legal doubt. The subject seizes at his peril, and the sovereign decides in the last resort, whether he will approve or disapprove of the act. The Thorshaven, 1 Edw. Adm. 102.

The authority of Puffendorf is still less in favor of the position of the claimant's counsel. In the section cited (book 8, c. 6. § 21), Puffendorf considers the question, to whom property captured in war belongs; a question also examined by Vattel, in the 229th section of the book and chapter above referred to. In the course of that discussion, Puffendorf observes, "that it may be very justly questioned, whether every thing taken in war by private hostilities, and by the bravery of private subjects, that have no commission to warrant them, belongeth to them that take it. For this is also a part of the war, to appoint what persons are to act in a hostile manner against the enemy, and how far. And in consequence, no private person hath power to make devastations in an enemy's country, or to carry off spoil or plunder, without permission from his sovereign. And the sovereign is to decide, how far private men, when they are permitted, are to use that liberty of plunder, and whether they are to be sole proprietors in the booty, or only to share a part of it. So that all, a private adventurer in war can pretend to, is no more than what his sovereign will please to allow him; for to be a soldier, and to act offensively, a man must be commissioned by public authority." As to the point, upon which Puffendorf here expresses his doubts, I suppose that no person, at this day, entertains any doubt. It is now clear, as I have already stated, that all captures in war enure to the sovereign, and can become private property, only by his grant. But is there any thing in Puffendorf to authorize the doctrine, that the subject so seizing property of the enemy is guilty of a very enormous crime, of the odious crime of piracy? Or is there, in this language, any thing to show, that the sovereign may not adopt the acts of his subject in such a case, and give them the effect of full and perfect ratification?

It has not been pretended, that I recollect, that Grotius supports the position contended for. To me it seems pretty clear, that his opinions lean rather the other way, namely, to support the indiscriminate right of captors to all property captured by them. Grot. lib. 3, c. 6, §§ 2, 10, 12. Bynkershoek has not discussed the present question in direct terms. In one place (Bynk. Pub. Jur. c. 3) he says, that he is not guilty of any crime

by the laws of war, who invades a hostile shore in hopes of getting booty. It is true, that in another place (Id. c. 20) he admits, in conformity to his doctrine elsewhere (Id. c. 17), that if an un-commissioned cruiser should sail for the purpose of making hostile captures, she might be dealt with as a pirate, if she made any captures, except in self-defence. But this he expressly grounds upon the municipal edicts of his own country, in relation to captures made by its own subjects. And he says, every declaration of war not only permits, but expressly orders, all subjects to injure the enemy by every possible means, not only to avert the danger of capture, but to capture and strip the enemy of all his property. And looking to the general scope of his observations (Id. cc. 3, 4, 16, 17), I think it may, not unfairly, be argued as his opinion, that independent of particular edicts, the subjects of hostile nations might lawfully seize each other's property, wherever found. At least, he states nothing, from which it can be inferred, that the sovereign might not avail himself of property captured from the enemy by non-commissioned subjects.

On the whole, I hold that the true doctrine of the law of nations, found in foreign jurists, is, that private citizens cannot acquire to themselves a title to hostile property, unless it is seized under the commission of their sovereign; and that, if they deprecate upon the enemy, they act at their peril, and may be liable to punishment, unless their acts are adopted by their sovereign. That, in modern times, the mere declaration of war is not supposed to clothe the citizens with authority to capture hostile property; but that they may lawfully seize hostile property in their own defence, and are bound to secure, for the use of the sovereign, all hostile property, which falls into their hands. If the principles of British prize law go further, I am free to say, that I consider them as the law of this country.

I have been led into this discussion of the doctrines of foreign jurists further than I originally intended, because the practice of this court in prize proceeding must, as I have already intimated, be governed by the rules of admiralty law disclosed in English reports, in preference to the mere dicta of elementary writers. I thought it my duty, however, to notice these authorities, because they seemed greatly relied on by the claimants' counsel.

In my judgment, the libel is well and properly brought, at least for all the purposes of justice between the parties before the court, and I overrule the exception taken to its sufficiency.

Having disposed of this objection, I come now to consider the objection made by the United States against the sufficiency of the claim of Mr. Brown; and I am entirely satisfied, that his claim must be rejected. It is the well known rule of the prize court, that

the onus probandi lies on the claimant. He must make out a good and sufficient title, before he can call upon the captors to show any ground for the capture. The Walsingham Packet, 2 C. Rob. Adm. 77. If, therefore, the claimant make no title, or trace it only by illegal transactions, his claim must be rejected, and the court left to dispose of the cause, as the other parties may establish their rights. In the present case, Mr. Brown claims a title by virtue of a contract and sale made by alien enemies since the war. I say by alien enemies, for it is of no importance, what the character of the agent is; the transaction must have the same legal construction, as though made by the aliens themselves. Now, admitting, that this sale was not colorable, but bonâ fide, which however I am not at present disposed to believe, still it was a contract made with enemies, pending a known war, and therefore invalid. No principle of national or municipal law is better settled, than that all contracts with an enemy, made during war, are utterly void. This principle has grown hoary under the reverent respect of centuries (19 Edw. 4, 6, cited Theol. Dig. lib. 1, c. 6, § 21; Ex parte Boussmaker, 13 Ves. 71; Bristow v. Towers, 6 Term R. 45), and cannot now be shaken, without uprooting the very foundations of national law. Bynk. Quest. Pub. Juris, c. 3; The Santa Cruz, 1 C. Rob. Adm. 50, 76. I therefore altogether reject the claim interposed by Mr. Brown.

What then is to be done with the property? It is contended on the part of the United States, that it ought to be condemned to the United States, with a recompense in the nature of salvage to be awarded to Mr. Delano. On the part of the claimant's counsel, (who, under the circumstances, must be considered merely as arguing, as amici curiae, to inform the conscience of the court) it is contended, 1. That this court, as a court of prize, has no proper jurisdiction over the cause; 2. That if it have jurisdiction, it cannot award condemnation to the United States, for several reasons; 1. Because by the law of nations, as now understood, no government can lawfully confiscate the debts, credits, or visible property of alien enemies, which have been contracted or come into the country during peace. 2. Because, if the law of nations does not, the common law does, afford such immunity from confiscation to property situated like the present. 3. Because, if the right to confiscate exists, it can be exercised only by a positive act of congress, who have not yet legislated to this extent. 4. Because, if the last position be not fully accurate, yet, at all events, this process being a high prerogative power, ought not to be exercised, except by express instructions from the president, which are not shown in this case.

Some of these questions are of vast consequence, and most extensive operation;—and I am exceedingly obliged to the gentlemen, who have argued them with so much ability and learning, for the light, which they have thrown upon a path so intricate and obscure. I have given these questions as much consideration, as the state of my health and the brevity of time would allow; and I shall now give them a distinct and separate discussion, that I may at least disclose the sources of my errors, if any, and enable those, who unite higher powers of discernment with more extensive knowledge, to give a more exact and just opinion.

And first, as to the jurisdiction of this court in matters of prize. This depends partly on the prize act of 26th of June, 1812, § 6 [2 Stat. 761], and partly on the true extent and meaning of the admiralty and maritime jurisdiction conferred on the courts of the United States. The act of the 26th of June, 1812, c. 107, provides, that in all cases of captured vessels, goods and effects, which shall be brought within the jurisdiction of the United States, the district court shall have exclusive original cognizance thereof, as in civil causes of admiralty and maritime jurisdiction. The act of 18th of June, 1812 [2 Stat. 755], declaring war, authorizes the president to issue letters of marque and reprisal to private armed ships against the vessels, goods and effects, of the British government and its subjects, and to use the whole land and naval force of the United States, to carry the war into effect. In neither of these acts is there any limitation, as to the places where captures may be made, on the land or on the seas, and of course it would seem, that the right of the courts to adjudicate respecting captures would be co-extensive with such captures, wherever made, unless the jurisdiction conferred is manifestly confined by the former act to captures made by private armed vessels. It is not, however, necessary closely to sift this point, as it may now be considered as settled law, that the courts of the United States, under the judicial act of 30th of September, 1789 [1 Stat. 73], have, by the delegation of all civil causes of admiralty and maritime jurisdiction, at least as full jurisdiction of all causes of prize, as the admiralty in England. Glass v. The Betsy, 3 Dall. [3 U. S.] 6; Talbot v. Janson, Id. 133; Penhallow v. Doane, Id. 54; Jennings v. Carson, 4 Cranch [8 U. S.] 2.

Over what captures then has the admiralty jurisdiction, as a prize court? This is a question of considerable intricacy, and has not as yet, to my knowledge, been fully settled.

It has been doubted, whether the admiralty has an inherent jurisdiction of prize, or obtains it by virtue of the commission usually issued on the breaking out of war. That the exercise of the jurisdiction is of very high antiquity, and beyond the time of memory, seems to be incontestable. It is found recognized in various articles of the Black Book of the Admiralty, in public treaties and proclamations of a very early date, and

in the most venerable relics of ancient jurisprudence.[3] In Lindo v. Rodney, Doug. 613, note, Lord Mansfield, in discussing the subject, admits the immemorial antiquity of the prize jurisdiction of the admiralty, but leaves it uncertain, whether it was coeval with the instance jurisdiction, and whether it is constituted by special commission, or only called into exercise thereby. After the doubts of so eminent a judge, it would not become me to express a decided opinion. But taking the fact, that in the earliest times the jurisdiction is found in the possession of the admiralty, independent of any known special commission; that in other countries, and especially in France, upon whose ancient prize ordinances the administration of prize law seems in a great measure to have been modelled,[4] the jurisdiction has uniformly belonged to the admiralty; there seems very strong reason to presume, that it always constituted an ordinary and not an extraordinary branch of the admiralty powers. And so I apprehend it was considered by the supreme court of the United States in Glass v. The Betsy, 3 Dall. [3 U. S.] 6. However the question may be, as to the right of the admiralty to take cognizance of mere captures made on the land, exclusively by land forces, as to which I give no opinion. it is very clear, that its jurisdiction is not confined to mere captures at sea. The prize jurisdiction does not depend upon locality, but upon the subject matter. The words of the prize commission contain authority to proceed upon all, and all manner of captures, seizures, prizes and reprisals, of all ships and goods, that are and shall be taken. The admiralty, therefore, not only takes cognizance of all captures made at sea, in creeks, havens and rivers, but also of all captures made on land, where the same have been made by a naval force, or by co-operation with a naval force. This exercise of jurisdiction is settled by the most solemn adjudications.[5]

Such then being the acknowledged extent of the prize jurisdiction of the admiralty, it is, at least in as ample an extent, conferred on the courts of the United States. For the determination, therefore, of the case before the court, it is not necessary to claim a more ample jurisdiction: for the capture or seizure, though made in port, was made while the property was water-borne. Had it been landed and remained on land, it would have deserved consideration, whether it could have been proceeded against as prize under the admiralty jurisdiction, or whether, if liable to seizure and condemnation in our courts, the remedy ought not to have been pursued by a process applicable to municipal confiscations. On these points I give no opinion.[6]

Having disposed of the question, as to the jurisdiction of this court, I come to one of a more general nature, viz. whether, by the modern law of nations, the sovereign has a right to confiscate the debts due to his enemy, or the goods of his enemy found within his territory at the commencement of the war. I might spare myself the consideration of the question, as to debts; but as it has been ably argued, I will submit some views respecting it, because they will illustrate and confirm the doctrine applicable to goods.

It seems conceded, and indeed is quite too clear for argument, that in former times the right to confiscate debts was admitted as a doctrine of national law. It had the countenance of the civil law (Dig. lib. 41, tit. 1; Dig. lib. 49, tit. 15), of Grotius (De Jure Belli et Pacis, lib. 3, c. 2, § 2; Id. c. 6, § 2; Id. c. 7, §§ 3, 4; Id. c. 13, §§ 1, 2), of Puffendorf (De Jure Nat. et Nat. lib. 8, c. 6, § 23), and lastly of Bynkershoek (Quest. Pub. Juris, lib. 1, c. 7), who is himself of the highest authority, and pronounces his opinion in the most explicit manner. Down to the year 1737, it may be considered as the opinion of jurists, that the right was unquestionable. It is then incumbent on those, who assume a different doctrine, to prove that since that period it has, by the general consent of nations, become incorporated into the code of public law. I take upon me to say, that no jurist of reputation can be found, who has denied the right of confiscation of enemies' debts. Vattel has been supposed to be the most favorable to the new doctrine. He certainly does not deny the right to confiscate. And if he may be thought to hesitate in admitting it, nothing more can be gathered from it, than that he considers, that in the present times a relaxation of the rigor of the law has been in practice among the sovereigns of Europe. Vattel, lib. 3, c. 5, § 77. Surely a relaxation of the law in practice cannot be admitted to constitute an abolition in principle, when the principle is asserted as late as 1737 by Bynkershoek, and the relaxation shown by Vattel, in 1775. In another place, however, Vattel speaking on the subject of reprisals, admits the right to seize the property of the nation or its subjects, by way of reprisal; and, if war ensues, to confiscate the property so

---

[3] See Rob. Coll. Marit. Introd. pp. 6, 7; Id. Instructions, 3 Hen. VIII. p. 10, art. 18, etc.; Id. p. 12, note; Letter Edw. III., A. D. 1343; Treaty Hen. VII. and Charles VIII., A. D. 1497; Rob. Coll. Marit. p. 83, etc., p. 98, art. 8; Rob. Coll. Mar. p. 189, note; Roughton, arts. 19, 20, etc., passim.

[4] Vide Ord. France A. D. 100; Rob. Coll. Marit. p. 75; Ord. France A. D. 1584; Id. p. 105; Treaty Hen. VII. and Car. VIII.; Id. p. 83, and Robinson's note, Id. 105.

[5] Key v. Pearse, cited in Le Caux v. Eden, Doug. 606; Lindo v. Rodney. Id. 613, note; The Capture of The Cape of Good Hope, 2 C. Rob. Adm. 274; The Stella del Norte, 5 C. Rob. Adm. 349; The Island of Trinidad, Id. 92; The Thorshaven, 1 Edw. Adm. 102; The Capture of Chinsurah, 1 Act. 179; The Rebeckah, 1 C. Rob. Adm. 227; The Gertruyda, 2 C. Rob. Adm. 211; The Maria Francoise, 6 C. Rob. Adm. 282.

[6] See The Ooster Eems. 1 C. Rob. Adm. 284, note; Hale de Portubus Maris. etc., in Harg. Law Tracts, c. 28, p. 245, etc.; Parker, 267.

seized. The only exception he makes is of property, which has been deposited in the hands of the nation, and entrusted to the public faith; as is the case of property in the public funds. Vattel, lib. 2, c. 18. §§ 342, 343, 344. The very exception evinces pretty strongly the opinion of Vattel, as to the general rule. Of the character of Vattel, as a jurist, I shall not undertake to express an opinion. That he has great merit is conceded, though a learned civilian (Sir James MacIntosh) informs us, that "he has fallen into great mistakes in important practical discussions of public law." Discourse on the Law of Nations, p. 32, note. But if he is singly to be opposed to the weight of Grotius and Puffendorf, and, above all, Bynkershoek, it will be difficult for him to sustain so unequal a contest.

I have been pressed with the opinion of a very distinguished writer of our own country on this subject. Camillus, Nos. 18–23, on the British Treaty, 1794. I admit in the fullest manner the great merit of the argument, which he has adduced against the confiscation of private debts due to enemy subjects. Looking to the measure, not as of strict right, but of sound policy and national honor, I have no hesitation to say, that the argument is unanswerable. He proves incontrovertibly, what the highest interests of nations dictate, with a view to permanent policy, but I have not been able to perceive the proofs, by which he overthrows the ancient principle. In respect to the opinion of Grotius, quoted by him in No. 20, as indicating a doubt by Grotius of his own principles, I cannot help thinking, that the learned writer has himself fallen into a mistake. Grotius, in the place referred to (L. 3, c. 20, § 16), is not adverting to the right of confiscation, but merely to the general results of a treaty of peace. He says (section 15) that after a peace, no action lies for damages done in the war; but (section 16) that debts due before the war are not by the mere operation of war released, but remain suspended during the war, and the right to recover them revives at the peace. It is impossible to doubt the meaning of Grotius, when the preceding and succeeding sections are taken in connexion; Grotius, therefore, is not inconsistent with himself: nor is "Bynkershoek more consistent;" for the latter explicitly avows the same doctrine, but considers it inapplicable to debts confiscated during the war, for these are completely extinguished. Bynk. Ques. Pub. Jur. c. 7. It is supposed by the same learned writer, that the principle of confiscating debts had been abandoned for more than a century. That the practice was intermitted is certainly no very clear proof of an abandonment of the principle. Motives of policy and the general interests of commerce may combine to induce a nation not to enforce its strict rights, but it ought not therefore to be construed to release them. It may however be well doubted if the practice is quite so uniform as it is supposed. The case of The Silesia Loan, which exercised the highest talents of the English nation, is an instance to the contrary, almost within a half century. (In 1752.) In the very elaborate discussions of national law, to which that case gave birth, there is not the slightest intimation, that the law of nations prohibited a sovereign from confiscating debts due to his enemies, even where the debts were due from the nation; though there is a very able statement of its injustice in that particular case. And the English memorial admits, that, when sovereigns or states borrow money from foreigners, it is very commonly expressed in the contract, that it should not be seized as reprisals, or in case of war. Now it strikes me, that this very circumstance shows in a strong light the general opinion, as to the ordinary right of confiscation.

The stipulations of particular treaties of the United States have been cited, in corroboration of their general doctrine, by the claimant's counsel. These treaties certainly show the opinion of the government, as to the impolicy of enforcing the right of confiscation against debts and actions.[7] But I cannot admit them to be evidence, for the purpose for which they have been introduced. It may be argued with quite as much, if not greater force, that these stipulations imply an acknowledgment of the general right of confiscation, and provide for a liberal relaxation between the parties. I hold with Bynkershoek (Ques. Pub. Jur. c. 7), that where such treaties exist, they must be observed; where there are none, the general right prevails.

It has been further supposed, that the common law of England is against the right of confiscating debts. And the declaration of Magna Charta, c. 30, has been cited to show the liberal views of the British constitution. This declaration, so far as is necessary to the present purpose, is as follows: "If they, (i. e. foreign merchants) be of a land making war against us, and be found in our realm, at the beginning of the war, they shall be attached without harm of body or goods (rerum) until it be known unto us, or our chief justice, how our merchants be entreated there, in the land making war against us; and if our merchants be well entreated there, theirs shall be likewise with us." I quote the translation of Lord Coke. 2 Inst. 57. This would certainly seem to be a very liberal provision, and if its true construction applied to all property and persons, as well transiently in the country, as domiciled and fixed there, it would certainly be entitled to all the encomiums, which it has received. Montesq. Spirit of Laws, bk. 20, c. 14. How far it is now considered as binding, in relation to vessels and goods found within the

[7] See Treaties with Great Britain, 1794, art. 10; with France, 1778, art. 20; with Holland, 8th Oct., 1782, art. 18; with Prussia, 11th July, 1799, art. 23; with Morocco, 1787, art. 24.

realm at the commencement of a war, I shall hereafter consider. It will be observed, however, that this article of Magna Charta does not protect the debts or property of foreigners, who are without the realm. It is confined to foreigners within the realm, upon the public faith, on the breaking out of the war. Vide The Santa Cruz. 1 C. Rob. Adm. 50, 63. Now it seems to be the established rule of the common law, that all choses in action belonging to an enemy are forfeitable to the crown; and that the crown is at liberty, at any time during the war, to institute a process, and thereby appropriate them to itself. This was the doctrine of the Year Books, and stands confirmed by the solemn decision of the exchequer in Attorney General v. Weeden, Parker, 267; Maynard's Edw. II., cited Id. It is a prerogative of the crown, which I admit has been very rarely enforced. See Lord Alvanley's Observations in Furtado v. Rogers, 3 Bos. & P. 191. But its existence cannot admit of a legal doubt. Antoine v. Morshead, 6 Taunt. 237, 1 Marsh. 558; Albretcht v. Sussmann, 2 Ves. & B. 323, 327.

On a review of authorities, I am entirely satisfied, that by the rigor of the law of nations, and of the common law, the sovereign of a nation may lawfully confiscate the debts of his enemy, during war, or by way of reprisal. And I will add, that I think this opinion fully confirmed by the judgment of the supreme court in Ware v. Hylton (3 Dall. [3 U. S.] 199), where the doctrine was explicitly asserted by some of the judges, reluctantly admitted by others, and denied by none.

In respect to the goods of an enemy found within the dominions of a belligerent power, the right of confiscation is most amply admitted by Grotius and Puffendorf, and Bynkershoek, and Burlemaqui, and Rutherforth, and Vattel.[8] Such also is the rule of the common law. Hale in Harg. Law Tracts, p. 245, c. 18. Vattel has indeed contended, and in this he is followed by Azuni (2 Az. p. 2, c. 4, § 7), that the sovereign declaring war can neither detain the persons nor the property of those subjects of the enemy, who are within his dominions at the time of the declaration, because they came into the country upon the public faith. This exception (which in terms is confined to the property of persons who are within the country) seems highly reasonable in itself, and is an extension of the rule in Magna Charta. But even limited as it is, it does not seem followed in practice, and Bynkershoek is an authority the other way. Bynk. Quest. Pub. Jur. cc. 2, 3, 7. In England the provision in Magna Charta seems in practice to have been confined to foreign merchants domiciled there, and not extended to others, who came to ports of the realm for occasional trade. Indeed,

from the language of some authorities, it would seem that the clause was inserted not so much to benefit foreign merchants, as to provide a remedy for their own subjects in cases of hostile injuries in foreign countries. See the opinion of Lee, C. J., in Key v. ⊥earse, Doug. 606, 607. However this may be, it is very certain that Great Britain has uniformly seized, as prize, all vessels and cargoes of her enemies, found afloat in her ports, at the commencement of war. Nay, she has proceeded yet further, and, in contemplation of hostilities, laid embargoes on foreign vessels and cargoes, that she might at all events secure the prey. It cannot be necessary for me to quote authorities on this point. In the articles respecting the droits of admiralty in 1665, there is a very formal recognition of the right of the crown to all vessels and cargoes seized before hostilities. The Rebeckau, 1 C. Rob. Adm. 227; Id. 230, note a. This exercise of hostile right, of the summum jus, is so far indeed from being obsolete, that it is constant operation, and in the present hostilities has been applied to the property of citizens of the United States. Of a similar character is the detention of American seamen, found in her service at the commencement of the war, as prisoners of war; a practice, which violates the spirit, though not the letter, of Magna Charta, and certainly can, in equity and good faith, find few advocates.

Of the right of Great Britain thus to seize vessels and cargoes found in her ports on the breaking out of war, I do not find any denial, in authorities which are entitled to much weight. And I therefore consider the rule of the law of nations to be, that every such exercise of authority is lawful, and rests in the sound discretion of the sovereign of the nation.

The next question is, whether congress, (for with them rests the sovereignty of the nation, as to the right of making war, and declaring its limits and effects) have authorized the seizure of enemies' property afloat in our ports. The act of the 18th of June, 1812, c. 102, is in very general terms, declaring war against Great Britain, and authorizing the president to employ the public forces to carry it into effect. Independent of such express authority, I think, that, as the executive of the nation, he must, as an incident of the office, have a right to employ all the usual and customary means acknowledged in war, to carry it into effect. And there being no limitation in the act, it seems to follow, that the executive may authorize the capture of all enemies' property, wherever by the law of nations it may be lawfully seized. In cases, where no grant is made by congress, all such captures, made under the authority of the executive, must enure to the use of the government. That the executive is not restrained from authorizing captures on land is clear from the provisions of the act. He may employ, and actually has employed, the land forces for that purpose; and no one has

[8] See Grotius and Puffendorf and Bynkershoek, ubi supra, and Bynk. Quest. Pub. Jur. cc. 4, 6; 2 Burlem. p. 209, § 12; Id., p. 219, § 2; Id., p. 221, § 11; Ruth. bk. 2, c. 9, pp. 558–573.

doubted the legality of the conduct. That captures may be made within our own ports by commissioned ships seems a natural result of the generality of expression, in relation to the authority to grant letters of marque and reprisal to private armed vessels, which the act does not confine to captures on the high seas, and is supported by the known usage of Great Britain in similar cases. It would be strange indeed, if the executive could not authorize or ratify a capture in our own ports, unless by granting a commission to a public or private ship. I am not bold enough to interpose a limitation, where congress have not chosen to make one; and I hold, that by the act declaring war, the executive may authorize all captures, which by the modern law of nations are permitted and approved.

It will be at once perceived, that in this doctrine I do not mean to include the right to confiscate debts due to enemy subjects. This, though a strictly national right, is so justly deemed odious in modern times, and is so generally discountenanced, that nothing but an express act of congress would satisfy my mind, that it ought to be included among the fair objects of warfare; more especially, as our own government have declared it unjust and impolitic. But, if congress should enact such a law, however much I might regret it, I am not aware that foreign nations, with whom we have no treaty to the contrary, could on the footing of the rigid law of nations complain, though they might deem it a violation of the modern policy.

On the whole, I am satisfied, that congress have authorized a seizure and condemnation of enemy property found in our ports, under the circumstances of the present case; and the executive may lawfully authorize proceedings to enforce the confiscation of the same property before the proper tribunals of the United States. The district attorney is for this purpose the proper agent of the executive, and of the United States. From the character and duties of his station, he is bound to guard the rights of the United States, and to secure their interests. Whenever he chooses to institute proceedings in behalf of the United States, it is presumed by courts of law, that he has the sanction of the proper authorities; and that presumption will avail, until the executive or the legislature disavow the proceedings, and sanction a restoration of the property.

I have taken up more time, than I originally intended, in discussing the various subjects submitted in the argument; an apology will be found in their extraordinary importance. If I shall have successfully shown, that the principles of prize law, as administered in England and in the United States, have the sanction of the principles of public law and public jurists, I shall not regret the labor that has been employed, although in this particular case I may pronounce an erroneous sentence.

I reverse the decree of the district court, and condemn the five hundred and fifty tons of timber to the United States; subject however to the right of the owners of the Emulous, to a reimbursement of their actual charges and expenses for the custody of the property, which I shall reserve for further consideration; and I shall order the said property to be sold, and the proceeds brought into court, to abide the further order of the court.