[redacted]

## Case No. 7,533.

The JOSEPH.

[1 Gall. 545.] [1]

Circuit Court, D. Massachusetts. Oct. Term. 1813.[2]

[redacted]

[1] [Reported by John Gallison, Esq.]

[2] [Affirmed in 8 Cranch (12 U. S.) 451.]

[redacted]

J. E. Sprague, for captors.

S. Putnam, for claimants.

G. Blake, for the United States.

STORY, Circuit Justice. The brig Joseph, owned by the claimants, who are American citizens resident in Boston, was captured by the privateer Fame, Benjamin Chapman commander, on the 16th of July, 1813, in Boston Bay. There is some dispute, as to the exact place of capture. In the preparatory examinations, the master states, "that she was captured in sight of Half Way Rock," (which rock is about a marine league from the shore), "off Salem harbor." The mate states, "that she was captured about ten leagues east from Boston light house." Taking both statements together, I am satisfied that she was captured a few miles without Half Way Rock, and beyond the territorial limits of the United States, if those limits are to be measured by the distance of a marine league from the nearest shore. It appears from the papers and evidence in the cause, that the brig sailed from Boston on or about the 6th of April, 1812, having on board a cargo on freight, on a voyage from thence to Liverpool, and thence to the north of Europe, and thence directly or indirectly to return to the United States. The brig arrived at Liverpool, and having discharged her cargo there, went to Hull, and took in another cargo of mahogany, which had been deposited there on a former voyage by the claimants, and on the 30th of June, 1812, sailed for St. Petersburg, under the protection of a British license, granted on the 8th of June, 1812, to continue in force until the first of November following, authorizing the export of the mahogany to St. Petersburg, and the importation of a return cargo to England. The license was granted upon the express condition, that the brig should receive convoy instructions, and sail under convoy during the voyage. The brig duly arrived at St. Petersburg, and there the master received news of the war between the United States and Great Britain. In a supplementary affidavit, the master states, that he inquired of the Hon. John Q. Adams, the American ambassador at the court of Russia, if there was any law against his returning to England with a license taken before the war, and was answered, that there was none. The cargo of mahogany not being sold, the brig took on board, on freight, from a German house at St. Petersburg, consigned to German houses in London, a cargo consisting of hemp and iron, with which she sailed from St. Petersburg, on or about the 7th of October, 1812; but the season being late, she was obliged to winter in Carlscrona in Sweden, and in the spring of 1813, having received convoy instructions from the Brit-

ish ship Ranger, sailed for London, where she arrived and delivered her cargo; and on or about the 29th of May, 1813, sailed for the United States in ballast. The master alleges, that his reason for taking the cargo of hemp and iron to England was, to enable him, out of the freight, to discharge his expenses at St. Petersburg, and that going to England was the only safe mode of effecting his return to the United States. There is a letter in the case, dated at Boston, 26th of April, 1812, addressed by the claimants to Captain Sargent, which, after informing him of the American embargo, proceeds: "It is the opinion of some, that war will take place between England and America. If that should be the case, we hope that you and Mr. Williams will secure the property." When and where this letter was received does not appear. Such are the material facts of the case, and certainly taken in its fair and reasonable bearing, it is a case entitled to considerable indulgence. Under the new and extraordinary circumstances of a public war, it would be hard to impute sinister motives to actions, which seem to have resulted from cautious attention, and to have been adopted after advice from distinguished authority, to relieve the party from a situation of considerable embarrassment. I am free therefore to declare, that I have come to the decision of the cause with great reluctance; but it has been pressed upon me with such urgency of manner (which I hope does not often accompany the zeal of captors in cases entitled to indulgence), that I readily yield my personal convenience, and will pronounce the decision, which, upon the most mature reflection, I have felt myself compelled to adopt.

The cause has been ably argued on the part of the claimants, and I will proceed to consider the various grounds, upon which it has been contended, that the brig is not subject to condemnation. And, in the first place, it is contended, that there has been no trading with the enemy, which can subject the property to condemnation, because it was lawful, before the war, to sail under a British license to St. Petersburg, and back to England. And the taking in of a return cargo on freight to England, after the war, was from necessity, to obtain funds to pay the expenses of the ship; and the opinion of the American minister, under the circumstances, was equivalent to a license. It will be recollected, however, that although the license was actually obtained before the war, yet the voyage was not actually commenced, until after war was declared; and although this was not known to the master, yet it could not but be known, that a state approaching to hostilities had for some time existed between the two countries. Further, the license was upon the express condition of assuming British convoy for the voyage, and however this might affect the property in an American court, it might be deemed

such an adoption of hostile conduct, and such a resistance of the right of search, as might compromit the neutral character of the property, so protected by a hostile convoy, in the courts of the opposing belligerent. See The Maria, 1 C. Rob. Adm. 340. However, I barely state these circumstances, without intending to lay any particular stress on them.

The trading with the public enemy, for which condemnation is sought, is the taking in and carrying a cargo on freight to England, after a full knowledge of the war. This is attempted to be justified, partly upon the opinion of the American minister, and partly on the ground of inability otherwise to meet the expenses of the voyage. To the character and learning of that minister I feel every disposition to pay the most ample homage. And knowing, as we all well do, his extraordinary intimacy with subjects of national law, I confess myself much inclined to doubt, whether the opinion, in the extent and manner it is now supposed, ought to be imputed to him. We have no written statement from himself. The observations appear to have passed in conversation, in which mistakes might easily creep in, and misconstructions easily arise, without any intention on his part to countenance a doctrine, which has been, for more than a century, overruled in national law. Vattel, and Bynkershoek, and Valin, and Sir Wm. Scott, assert a contrary doctrine, in the most explicit terms; and it cannot lightly be imagined, that the opinions of these great men, on this subject, can have escaped his researches. I feel myself bound therefore to believe, that the opinion given was with qualifications, which do not now appear in the testimony before the court. Be this as it may, and even admitting, that our minister did, in the most explicit terms, countenance the voyage, and assert its legality, it cannot vary the legal result before this tribunal. It may add much weight to the other circumstances entitling the party to the indulgence of the government, but it cannot authorize this court to pronounce a decree, which the law would otherwise repudiate. The courts of the United States can admit no other regulators of their conduct, than the laws pronounced and promulgated by the constituted authorities; and I hope it will not be deemed presumptuous, that, when they have felt themselves compelled to reject as illegal the acts and instructions of the executive himself, they should not yield to the mere supposal of an opinion of one of the foreign ministers. I lay out of the case, therefore, all consideration of the opinion imputed to the Hon. Mr. Adams.

As to the supposed necessity of taking the cargo on freight to England, in order to pay the ship's expenses, it is a circumstance entitling the party to the benignant consideration of the government, but can form no legal excuse. The cases cited in The Hoop,

1 C. Rob. Adm. 196, and Potts v. Bell, 8 Term R. 548, are decisive. The result of those cases is summed up by Sir W. Scott, in this emphatic language: "The cases, which I have produced, prove that the rule has been rigidly enforced, where acts of parliament have, on different occasions, been made to relax the navigation law, and other revenue acts; where the government has authorized, under the sanction of an act of parliament, a homeward trade from the enemy's possessions, but has not specifically protected an outward trade to the same, though intimately connected with that homeward trade, and almost necessary to its existence; that it has been enforced, where strong claims, not merely of convenience, but almost of necessity, excused it on behalf of the individual; that it has been enforced, where cargoes have been laden before the war, but where parties have not used all possible diligence to countermand the voyage after the first notice of hostilities; and that it has been enforced, not only against the subjects of the crown, but likewise against those of its allies in the war." And, in the passage immediately preceding, he says, "That the rule is so firmly established, that no one case exists, which has been permitted to contravene it." It has indeed been supposed in the argument, that the authority of these decisions is somewhat shaken by a subsequent decision of Sir W. Scott in The Madonna delle Gracie, 4 C. Rob. Adm. 195. It is clear, however, that the learned judge did not so consider it; and I have repeatedly had occasion to declare, that I consider the case as standing upon peculiar grounds, and not as affecting the general rule. The property, having been purchased on account of the British government, was held to be entitled to the same consideration, as if owned by the government, or as if protected by its immediate license. The supposed necessity of the trade cannot, therefore, upon acknowledged and settled principles (which I forbear to repeat, as they have been so frequently before the court), justify the party in the return voyage to England. Indeed, independent of this supposed necessity, the trade would have been of an extremely obnoxious character. The cargo consisted of hemp, which in general is contraband of war, and of iron, which is highly important to the naval equipments of the enemy. It was undertaken in connexion with the enemy, and accomplished under the convoy and orders of his ships of war. It is a trade, therefore, in which neutrals could not engage without imminent hazard, and I think it would have been difficult to exempt a neutral ship with such a cargo, under such a convoy, from the penalty of confiscation. How much more noxious would such a voyage be in a citizen of the other belligerent? It has been suggested, that the cargo being shipped by a neutral house in St. Petersburg, consigned to German houses in London, the latter are to be considered as neutral, and

therefore there was no trade at all with the enemy. There is certainly no foundation for this suggestion. Admitting that the German houses in London consisted altogether of German partners, it is quite impossible to contend, that they are neutrals. It is not the birth or native allegiance, but the domicil, that decides, in cases of this nature, the national character of the parties. See Curt. Dig. tit. "National Character," where all the authorities may be found. If a neutral subject be domiciled, and carry on trade in an enemy's country, he is held, as to all commercial purposes, an enemy. There can be no doubt, therefore, that the German houses in London were, as to all purposes of trade, enemies, and their property liable to confiscation as hostile property.

It has been further argued, that a declaration of war is, in effect, a command to the citizens of the belligerent country abroad at the time, to return home, and that the law allows a reasonable time and way to effect it. I am not aware of any principle of public law, which obliges every absent citizen to return to his country, on the breaking out of a war; nor has any authority been produced which countenances the position. It may be admitted, that the sovereign power of the country has a right to require the services of all its citizens, in time of war, and for this purpose may recall them home under penalties for disobedience. But until the sovereign power has promulgated such command, the citizens of the country have a perfect right to pursue their ordinary business and trade in and with all other countries, except that of the enemy. Upon any other supposition, all foreign commerce would, during war, be suspended; for if it were the duty of absent citizens to return, it would, upon the same principle, be the duty of those at home to remain there. As to citizens in the hostile country, the declaration of war imports a suspension of all further commerce with such country, and obliges them to return, unless they would be involved in all the consequences of the hostile character. If they wish to return, they must do it in a manner, which does not violate the laws; and their property cannot be removed with safety from the enemy country, unless under the sanction of their own government. But even if the position were generally true, that is contended for, the law would never deem that a reasonable mode of conveying property home, which involved it in a noxious trade with the public enemy. That can never be held to be a reasonable mode of returning a ship to the United States, which involves her in a traffic forbidden by the laws. However, I am well satisfied, that the position cannot be maintained in any extent adequate to the purpose, for which it has been introduced.

I have thus considered all the grounds, upon which this case has been attempted to be exempted from the imputation of a trade with the enemy; and as, in my judgment,

they are utterly insufficient, I hold the case to fall within the general doctrine. And here we are met with another objection. It is said, that if any offence was committed, it was completed upon the delivery of the cargo in Great Britain: and the vessel is not liable to capture on that account in the subsequent voyage to the United States. It may be admitted, for the purposes of this argument, that the vessel could be liable to seizure and capture for this offence, only during the voyage (by which I mean the entire voyage), and while the property remained in delicto. But I cannot perceive, how any question, as to two distinct voyages, properly arises in this case. The original voyage, as the claimants themselves admit, and the evidence proves, was from Boston to England, and thence to the north of Europe, and thence directly or indirectly back to the United States. No new voyage is pretended to have been undertaken, unless that from St. Petersburg to London be a new one. And the claimants themselves admit, that it was undertaken, not as a new voyage, but as merely subsidiary to their voyage home. It was, therefore, a voyage for Boston by the way of London. The testimony of the master is full to the same purpose. In his answer to the 7th interrogatory, he says, "that his last voyage began at Boston, and was to have ended there." And indeed if the evidence were not thus decisive, I should have had no doubt, that the right to capture for the offence continued until the brig actually returned to the ports of this country. On the whole, I am satisfied that this vessel was captured in delicto, and that the penalty of confiscation for a trade with the enemy attaches to her.

The remaining question is, to whom the property ought to be condemned—to the captors or to the United States? As it was captured trading with the enemy, the property is considered, as pro hac vice belonging to the enemy, and consequently good prize to the captors. This doctrine was attempted to be shaken in The Nelly, 1 C. Rob. Adm. 219, note, but Sir William Scott, after stating that the uniform course of decisions had pronounced the property to be forfeited as prize, said, "it is impossible for me not to pronounce, that this property is forfeited as prize to the captors." I have uniformly adhered to that decision, and until I am taught otherwise by a superior tribunal, I shall continue to hold it the law of the land. It is, however, argued, that the capture was illegal, and conveyed no title to the captors, because it took place within the territorial limits of the United States, or in other words, within cannon shot of the land. It might be a sufficient answer to this objection, that the facts do not warrant this conclusion. It is clear from the evidence, that the brig was not within a marine league of the shore. I am willing, however, to consider how the objection would have stood, upon the supposition, that the capture was actually made on the coast of the United States, within a marine league of the shore. The objection seems bottomed upon the ancient doctrines in Great Britain, relative to captures, which are droits of the admiralty, or which belong to the king jure coronae. It seems clear, that in England, by very ancient grants from the crown, the lord high admiral has the benefit of all captures made by non-commissioned vessels, and also of all captures, by whomsoever made, of all ships and goods coming or already come into ports, creeks or roads of England and Ireland, by stress of weather or other accident, or by mistake of port, or by ignorance, not knowing of the war, and also of all derelicts. But the king reserved to himself, in right of his crown, all such ships and goods, as should be seized in port on the breaking out of war, and also all such, as should come in voluntarily upon revolt, or be driven or forced into port by the king's men of war. The Rebeckah, 1 C. Rob. Adm. 227, 229, note; The Gertruyda, 2 C. Rob. Adm. 211. The grants to the lord high admiral have always received a strict construction, because they go to create a perpetual alienation of certain prerogatives from the crown. Therefore it is settled, that it is not sufficient, that a ship be about to go into a port or roadstead, to entitle the admiral, but she must be actually entering, and in ipsis faucibus portus (The Rebeckah, 1 C. Rob. Adm. 227); and the roadstead must not only be a place for anchorage, but a place for anchorage to unload and load cargoes (Id., and The Maria Francoise, 6 C. Rob. Adm. 282). Independent however of these grants to the lord high admiral, I apprehend that no doubt could arise in England, as to the right of any commissioned vessel to seize any enemy property, within the ports or on the coasts of the kingdom. It is true, that all rights of prize belong originally to the crown, and the beneficial interests derived to others can proceed only from the grant of the crown (The Elsebe, 5 C. Rob. Adm. 173; 11 East, 619; The Maria Francoise, 6 C. Rob. Adm. 282), and therefore, all captures, wherever made, enure to the use and benefit of the crown, unless they have been granted as droits to the admiralty, or as prize to the captors.

It has been usual, at least since the reign of Queen Anne (St. 6 Ann. c. 13) for parliament, on the breaking out of war, to grant, with a few exceptions, the whole interest in prizes, made by commissioned vessels, to the captors, to be distributed in such proportions, as the crown should by proclamation provide. In cases not within the purview of any act of parliament, the crown has usually made a grant of its royal bounty equally extensive. The beneficial interest of captors in prizes must therefore depend upon the public or royal grant; the authority to capture must depend altogether upon the extent of the commission issued to a public or private vessel. Each may have a right to capture in cases, where no beneficial interest may accrue to

the captors—although, in general, the rights are co-extensive. In former times, the crown, on the breaking out of war, issued commissions to public and private vessels, in such form and extent as suited its own discretion. The authority, as to the commissions of public ships, has not, to my knowledge, ever been restricted; but since the statute 13 Geo. II., c. 4, it has been usual, in the acts of parliament, to restrain the commissions of privateers to "the attacking, surprising, seizing, and taking, by such ship or vessel, or the crew thereof, any place or fortress upon the land, or any ship or vessel, goods, ammunition, arms, stores of war, or merchandize, belonging to or possessed by any of his majesty's enemies, in any sea, creek, haven, or river." This restriction is undoubtedly founded upon the policy of discouraging depredations upon the coasts of the enemy, for the purpose of plundering individuals. See Acts 17 Geo. II. c. 34; 19 Geo. II. c. 67; 21 Geo. III. c. 15, etc.; Thorshaven, 1 Edw. Adm. 102.

With a view indeed to the same policy, by a recent act of parliament, (which I have not had an opportunity to see) the right of capture by public ships is restrained to "any fortress upon the land, or any arms, ammunition, stores of war, goods, merchandize, and treasure, belonging to the state, or to any public trading company of the enemies of the crown of Great Britain, upon the land." And Sir William Scott (Thorshaven, 1 Edw. Adm. 102), commenting upon this clause of the act, observes that the commissions of privateers do not, under the act, extend to the capture of private property on land, and that such a right is not granted even to king's ships: that the interests of the king's cruisers are expressly limited, with respect to the property, in which the captors can acquire any interest of their own, the state still securing to itself all private property, in order that no temptation might be held out for unauthorized expeditions against the subjects of the enemy. And, as to privateers, he states, that it was the intention of parliament to limit their captures "to fortified places, and fortresses, and to property waterborne," "in any sea, creek, river, or haven." Independent, however, of these restraining acts of parliament, and in cases which they do not reach, it never has been doubted, that the crown might grant commissions to privateers as extensive as it pleased. And in the only forms, which have fallen under my observation (Marr. Adm. Form. 110; 2 C. Rob. Appx. Nos. 8, 9), the grant of the crown seems in as general terms as possible. But it has never been thought at any time, that captures by privateers were exclusively confined to the high seas, independent of any acts of parliament; on the contrary, these have been uniformly deemed restrictive. See Lindo v. Rodney, Doug. 613, note; Thorshaven, 1 Edw. Adm. 102. Captures indeed may be made, by privateers or public ships, under circumstances which will entitle the crown to hold them droits of admiralty, but this has never been supposed to destroy the right to capture.

If there be nothing in the language of the acts of parliament, or of the commission or prize proclamations and instructions, to affect the case, I take it for granted, that by the prize law of England, a privateer may lawfully make captures within the territorial limits of the realm on the sea coast. Against the generality of this doctrine, I have not been able to find a single opposing authority, and the very silence of the books in a case of so frequent occurrence affords a strong argument in its favor. On the other hand, in the cases of the Rebeckah, and the Maria Francoise, where the claims of the admiralty were rejected, no question was raised, as to the right of capture within the territorial limits of the country, (although the facts might well have raised it), and the property was condemned to the captors, as good and lawful prize.

In the United States, there are not, strictly speaking, any such things as droits of admiralty. The sole and exclusive right to all prizes rests in the government, and no individual can acquire any interest therein, unless under its grant and commission; and all captures, therefore, made without such grant and commission enure to the use of the government, by virtue of its general prerogative. This, as Sir W. Scott observes, (The Elsebe, 5 C. Rob. Adm. 173), is no peculiar doctrine of the English constitution; it is universally received as a necessary principle of public jurisprudence, by all writers on the subject; "bello parta cedunt reipublicae" (see Vattel, bk. 3, c. 15, § 229). And the government, in such case, do not take the property, as droits of admiralty, but strictly and technically jure reipublicae. In order to decide on the rights of captors in the United States, it is necessary to look into the laws, which the legislature have enacted on the subject; for no beneficial interest can pass to them beyond the terms of the grants, which have been made by congress; and on the other hand, no abridgment of their rights, unauthorized by the laws, can be of validity. By the act declaring war (Act 18th June, 1812, c. 102 [2 Stat. 755]), the president is authorized to employ the whole land and naval force of the United States, to carry the war into effect, and to issue to private armed vessels of the United States commissions or letters of marque and general reprisal, in such form, as he shall think proper, against the vessels, goods and effects of the government of the United Kingdom of Great Britain and Ireland, and the subjects thereof. It has been argued, on behalf of the United States, in some of the causes before the court, that the authority to the president to issue commissions in such form as he should think proper, includes a power to abridge the general rights of capture by excepting classes of cases, as the president shall from time to

time deem expedient. I cannot yield to this construction. The act requires, that the commission should include general reprisals, and leaves nothing but the form to the control of the executive. Nor do I conceive, that the act of the 26th of June, 1812, c. 107 [2 Stat. 759], in any part thereof, and particularly, in the 8th section, by authorizing the president to issue instructions for the better governing and directing the conduct of privateers. meant to restrict. or in any wise abridge the general authorities flowing from the former act. It is not, however, necessary very nicely to sift this point, because the president has not, in fact, either in the commission or in the instructions, restrained privateers from making captures on the coasts of the United States. The commission contains an authority "to subdue. seize and take, any armed or unarmed British vessel, public or private, which shall be found within the jurisdictional limits of the United States, or elsewhere on the high seas, or within the waters of the British dominions, and such captured vessel, with her apparel, &c. and the goods or effects, which shall be found on board the same, together with all the British persons, &c. to bring within some port of the United States." And further, "to detain, seize and take, all vessels and effects, to whomsoever belonging, which shall be liable thereto, according to the law of nations, and the rights of the United States, as a power at war;" and to bring the same within some "port of the United States," &c. The instructions accompanying the commission state, that "the high seas,'" in the commission, generally extend to low water mark; and not a syllable is contained therein, which restrains the general language of the commission. So far from captures being prohibited within our jurisdictional limits, they are expressly authorized by the commission. As therefore there is no limitation, either in the grant of prize by congress, or in the commission or instructions of the president, abridging the right of capturing prizes within a marine league of the coast, I think it clear, that the captors have as full powers and authorities there, as in captures upon the broad ocean. It is quite a distinct question, whether some limitation might not have been prudent, upon which I do not however presume to have an opinion.

It is been further supposed, that the commission and grant of prizes provided by law do not attach upon property like this, because the grant and commission is of the property of the enemies of the United States, to wit, the British government and its subjects. This objection has in part been answered before (see The Nelly, 1 C. Rob. Adm. 219, note); and, certainly, it might be more plausibly urged against the letters of marque issued by the British government. I will content myself with barely quoting from The Elsebe, 5 C. Rob. Adm. 173, the

answer of Sir Wm. Scott to an objection of this same nature, which I consider so decisive, as to require no further comment. "It is contended," says he, "that no grant of prize, made by the crown, attaches upon such property as this, (i. e. in the case before him, neutral property) because the grant is of property of the king's enemies, that is, of the French and other nations, with whom we are at war. But the grant is not so construed and applied. It is held, in construction and practice, to embrace all property liable to be condemned as prize, and not particularly reserved by the rights of the crown or of the admiralty. By fiction, or rather by intendment of law, all property condemned is the property of enemies, that is, of persons so to be considered in the particular transaction; and half the business of this court is exercised on such property, in determining, whether it is not liable to be condemned, as prize to the captors. It is therefore a position not seriously to be maintained, that the captors' grant does not reach to this extent, by the constant course of interpretation authorizing such a construction."

It has been further argued, that the capture was not legal, because the brig was actually coming into a port of the United States, and therefore, there was no meritorious service performed, entitling the party to the recompense of prize. But it may be answered to this, that the right of the captors to prize is not like the right to salvage, founded upon any supposed meritorious service. It depends exclusively upon the commission. The captors may have exhibited the utmost gallantry and enterprise, and accomplished the most arduous services, and yet if they have no commission, the prize belongs exclusively to the government. On the other hand, if they have a commission, although there may have been scarcely any exertion, and the property may, by mere good fortune. have fallen into their lap, they share the whole, as undisputed prize. And if the property belong to enemies, or from the nature of the transaction, is to be deemed pro hac vice the property of enemies, it is quite immaterial, whether the property be going from, or coming to a port of this country. And where the offence has been a trade with the enemy, the cases make no distinction, whether the voyage was from, or to the ports of the capturing power. In some of the cases, it is clear, that the property was bound to a port within the British dominions, at the time of capture.[3]

On the whole, as none of the distinctions assumed by the claimants can, in point of law, prevail, I feel myself bound to declare,

---

[3] Potts v. Bell. 8 Term R. 548; The Elizabeth of Ostend (in 1749) [Sir B. Simpson's MSS.]; The Ringende Jacob (in 1747) [1 C. Rob. Adm. 202]; The Compte de Wohronzoff (in 1781) [Id. 205]; The Expedite van Roterdam (in 1782) [Id. 206]; The William (in 1795) [Id. 214]; and The Hoop, 1 C. Rob. Adm. 196. in which last case, and in Potts v. Bell, the other cited cases will be found.

that the property must be condemned to the captors, as good and lawful prize. It is a case, in which the captors seem disposed to exercise the summum jus, a course which I must regret, but have no authority to prevent.

The operation of the president's instruction of the 28th of August, 1812, on the present case, was elaborately considered by the learned judge of the district court, in pronouncing his decree. I have had an opportunity, in the case of the brig Alexander and cargo, at this term, to express my opinion on that instruction, and to that opinion I do not think it necessary to add any thing in this place.

I reject the claims of the United States, and of Messrs. Dall and Vose, and pronounce the brig Joseph and her appurtenances, good and lawful prize to. the captors.