Mr. Justice SWAYNE
 

 delivered the opinion of the court.
 

 In the English maritime jurisprudence the jurisdiction of the admiralty court on the instance side, and the jurisdiction in prize, are entirely distinct and independent of each other. When exercising one, it is called the instance court, and the prize court, when exercising the other. The rules of procedure and adjudication in the latter are said to he no more like those which prevail in the former, than they are like those of any court in Westminster Hall. But from time immemorial both jurisdictions have been exercised by the same judge. As judge of the admiralty or instance court he is appointed by a commission under the great seal. This commission specifies fully and particularly the subjects of his jurisdiction, but is wholly silent as to prize. To give that jurisdiction, and bring it into activity, a commission under the great seal, in every war, was issued to the lord high admiral, to require the judge of admiralty to take cognizance of all captures, seizures, prizes,, and reprisals of all ships and goods that should be taken, and to hear and determine according to the course of the admiralty and the law of nations. A special warrant was thereupon issued by the admiral. Since the reign of Elizabeth it does not appear that any special authority has been given to the judge. He has exercised exclusive jurisdiction in prize under his commission from the king, or under the power inherent in his office, or by virtue of both.
 
 *
 

 
 *392
 
 Prize was wholly the creature of the crown. No one could have any interest but what he took as the gift of the king. Beyond this he could claim nothing. The reasons upon which the rule was founded were: that right of making war and peace was exclusively in the sovereign; that the acquisitions of war must, therefore, belong to him, and that their disposal might be of the ¿utmost importance for the purposes both of war and peace. It was held that it must be presumed from these considerations that the government did not intend to divest itself of this important attribute, except in so far as such a purpose was clearly and unequivocally expressed. The right is not the private property of the sovereign, but a trust confided to him for the public good. In private grants the construction is most strongly against the grantor. In all concessions touching capture the opposite rule prevails. A presumption arises against the grant, and it can only be rebutted by language so explicit as to leave no room for doubt upon the subject.
 
 *
 

 The lord high admiral exists now only in contemplation of law. It was deemed expedient to assign to him a certain portion of the rights of the crown to maintain the dignity and splendor of his office.
 
 †
 
 Hence the doctrines of droits of the admiralty, and of captured property which belonged to the king,
 
 virtute coronce.
 
 The lord high admiral is now represented by the king, who holds the office, but in a capacity distinct from his regal character, and the droits which belonged to the office, so far as they still subsist and are not otherwise disposed of, have in the progress of time become reattached to the crown.
 
 ‡
 

 To the legal scholar the subject is full of the interest of antiquarian research, but its examination is not necessary to ■ the decision of the present case. The proper limits of this opinion forbid us to pursue the inquiry further.
 

 While the American colonies were a part of the British empire, the English maritime law, including the law of prize,
 
 *393
 
 was the maritime law of this country. From the close of tbe Revolution down to this time it has continued to he our law, so nir as it is adapted to the altered circumstances and condition of the country, and has not been modified by the proper national authorities.
 
 *
 
 In our jurisprudence there are, strictly speaking, no droits of admiralty. The I’nited States have succeeded to thp rights of the crown. No one can have any right or interest in any prize except by their grantor permission. All captures made without their express authority enure
 
 ipso facto
 
 to their benefit. Whenever a claim is set up its sanction by an act of Congress must be shown. If no such act can be produced the alleged right does not exist. The United States take captured property, not as droits, but strictly and solely yuré
 
 reipdblicc.
 

 †
 

 During the late civil war a land and naval force of the United States were beleaguring Charleston in South Carolina. The rebel fortifications and forces kept both at hay. This had been the condition of things for a considerable period. In the night of the 17th February, 1865, the insurgent troops evacuated the neighboring forts and abandoned the city. This became known the next morning. The fleet thereupon approached the city by water and the army by land. The Gladiolus, a steam propeller of the navy, was one of the leading vessels. When she was oft’ the Battery at Charleston,'a boy from the shore gave information that a blockade-runner was lying near by in Ashley River. A boat’s crew from the Gladiolus was dispatched in quest of her. They found her on fire and surrounded by boats filled with colored people from the shore. The crew of the boat and others present proceeded to put out-the fire. The Gladiolus reached the scene a few minutes after the arrival of the boat. The fire was extinguished; the crew of the Gladiolus assisted in putting it out. It was found that the pipes of the vessel had been cut and that she was filling with water. The Gladiolus towed her to shallow water and her leaks were stopped,
 
 *394
 
 She was the Siren, a side-wheeled steamer of about one hundred and fifteen tons burden, and had run the blockade the night before. That morning her crew had cut her pipes, set her on fire, and abandoned her. She was sent to Boston for trial as prize of war. On her way she collided with another vessel. She was libelled by the United States in the District Court of Massachusetts» On the 7th of April, 1865, she was condemned as lawful prize and subsequently sold. All questions as to the distribution of the proceeds were left open by the decree for future adjudication. The owners of the vessel collided with, intervened and claimed damages. They were allowed by this court on appeal.
 
 *
 
 Salvage was claimed in behalf of the Gladiolus. One-half of the proceeds of the sale was also claimed for that vessel as prize money. The other appellant vessels of war claimed to participate with her. A decree of distribution was made on the 3d of July, 1869. The court allowed the claim for salvage, and ordered that the residue of the fund, less the sums decreed for damages arising from the collision, should be paid over to the United States. The appellants have brought this decree before us for review.
 

 Four acts of Congress have been passed allowing captors to participate in the fruits of the propei'ty captured. They are the act of 1799,
 
 †
 
 that of 1800;
 
 ‡
 
 that of 1862,
 
 §
 
 and that of 1864.
 
 ||
 
 It is necessary in this case to consider only one clause of the 10th section of the act last mentioned, which is as follows: “ The net proceeds of all property condemned as prize, when the prize was of superior or equal force to the vessel or vessels making the capture, shall be decreed to the captors. And when of inferior force, one-half shall be decreed to the United States and the other half to the captors.”
 

 No provision is found in any of these' statutes touching joint captures by the army and navy. They are wholly
 
 *395
 
 silent as to the military arm of the service. It results from this state of things, according to the principles we have laid down, that such captures enure exclusively to the benefit of the United States. In the English law they are held not to be within the prize acts, and are provided for by statutes passed specially for that purpose. In the Genoa and its dependencies,
 
 *
 
 Lord Stowell,-speaking of the word “prize,” says: “It evidently means maritime capture effected by maritime force only,—ships and cargoes taken by ships.” . . “What was taken by a conjunct expedition was formerly erroneously considered as vested in a certain proportion of it, in the capturing ships under the prize acts; but in a great and important case lately decided,
 
 †
 
 it was determined that the whole was entirely out of the effect of those prize acts, and in so deciding, determined by direct and included consequence, that the words * prizes taken by any of her Majesty’s ships or vessels of war,’ cannot apply to any other cases than those in which captures are made by ships only.”
 

 In
 
 Booty in the Peninsula,
 

 ‡
 

 the same great authority, referring to “a conjunct expedition,” held this language: “It may be difficult, and perhaps perilous, to define it negatively and exclusively. It is more easy and safe to define it affirmatively, that that is a conjunct expedition which is directed by competent authority, combining together the actions of two different species of force, for the attainment of some common specific purpose.”
 

 The opinion of the court below proceeded upon the ground that the present ease is one of this character. Whether it was or was not is the question presented for our determination. The application of Lord Stowell’s test leaves no room for doubt as to its proper solution.
 

 We have already adverted to the ingress of the navy into the harbor'of Charleston on the morning of the 17th of February. At nine o’clock that morning an officer of the land forces hoisted the national flag over the ruins of Fort
 
 *396
 
 Sumter. Flags were also raised over Forts Ripley and Pinckney. At ten o’clock a military officer reached Charleston. The mayor surrendered the city to him. Four hundred and fifty pieces of artillery, military stores, and much other property were captured with it. Contemporaneously with these things was the seizure of the Siren by the Gladiolus, and the approach and arrival of the rest of the fleet.
 

 The two forces were acting under the orders of a common government, for a common object, and for none other. They were united in their labors and their perils, and in their triumph they were not divided. They were converging streams toiling against the same dike. When it gave way-both swept in without any further obstruction. The consummation of their work was the fall of the city. Either force, after the abandonment of their defences by the rebels, could have seized all that was taken by both. The meritorious service of the Gladiolus was as a salvor, and not as a captor. Precedence in the time of the arrival of the respective forces is an element of no consequence. Upon principle, reason, and authority we think the judgment of the District Court was correctly given. The decree of condemnation committed the court to nothing as to the distribution. The course pursued was eminently proper under the circumstances, and according to the course of practice,in proceedings in prize.
 
 *
 
 The allowance of salvage by the court below was not objected to in the argument here.
 

 It has been suggested that the capture was within the 7th section of the act of the 2d of July, 1864,
 
 †
 
 which declares that “ no property seized or taken upon any of the inland waters of the United States by the naval forces thereof shall be regarded as maritime prize,” &c. The aspect in which the case has been examined, and the conclusions reached, render it unnecessary to consider that proposition, and we express no opinion upon the subject.
 

 Decree affirmed.
 

 *
 

 Lindo
 
 v.
 
 Rodney, 2 Douglas, 613, note.
 

 *
 

 The Elsebe, 5 Robinson, 155.
 

 †
 

 The Maria Francoise, 6 Id. 293.
 

 ‡
 

 The Rebeckah, 1 Id. 227 ; The Mercurius, Ib. 81; The Joseph, 1 Gallison, 545; 3 Reeves’s History of the English Law, 197.
 

 *
 

 Thirty hogsheads of Sugar
 
 v.
 
 Boyle and others, 9 Cranch, 198.
 

 †
 

 The Joseph, 1 Gallison, 555, 558; Dos Hermanos, 10 Wheaton, 310.
 

 *
 

 The Siren, 7 Wallace, 152.
 

 †
 

 1 Stat. at Large, 715.
 

 ‡
 

 2 Id. 52.
 

 §
 

 12 Id. 606.
 

 ||
 

 13 Id. 306.
 

 *
 

 2 Dodson, 446.
 

 †
 

 Hoagskarpel, Lords of Appeal, 1785.
 

 ‡
 

 1 Haggard, 47.
 

 *
 

 The Maria Francoise, 6 Robinson, 292.
 

 †
 

 13 Stat. at Large, 377.