# THE MANILA PRIZE CASES.[1]

## APPEALS FROM THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

Nos. 309, 310, 311.   Argued October 28, 29, 1902—Decided January 23, 1903.

While the right of the citizen to demand condemnation of vessels or property as prize for his benefit must be derived from acts of Congress, and their scope is not to be enlarged in his favor by construction, where there is no controversy in respect to the existence of the grant, a more liberal construction may be applied in carrying the intention of Congress into effect.

1. Vessels lying on the bottom in shallow water in such condition, as the result of a naval engagement, that they cannot be floated by any of the means possessed by the naval force overcoming them, but which are afterwards, by the independent means of the Government, raised and repaired and appropriated to its own use are not to be regarded as sunk or destroyed within the meaning of sec. 4635, Rev. Stat., but they may be regarded as within the provisions of secs. 4624 and 4625, and their money value may stand in place of prize and be so adjudicated.

2. The legal status of property taken from vessels in such condition must be regarded as the same as the vessel to which it belongs.

3. Naval stores—public enemy property—designed for hostile uses, stored on the sea shore in an establishment for facilitating naval warfare, when taken by a naval force, as a result of a naval engagement, can be adjudged as prize for the benefit of the captors.

As the right of the government of the capturing naval force is supreme, it may when in its judgment the public interest demands it, restore a prize; and the courts cannot proceed to condemnation as to captured property restored under a treaty of peace before decree.

The strength of the capturing naval force under Admiral Dewey's command at Manila was superior to that of the Spanish fleet on May 1, 1898.

4. Cascoes, or native boats, and certain floating derricks, property of private persons in the Philippine Islands, were rightly held by the District Court not to be subject to condemnation as prize.

5. Vessels performing the functions of colliers and not in a condition to render effective aid, if required, during a naval engagement and the masters and crews thereof who have been shipped, but who are not commissioned or enlisted men in the United States Navy, are not entitled to participate in prize money or bounty resulting from the capture and destruction of the enemy's vessels.

[1] Docket titles—*United States* v. *Dewey*, No. 309.   *Dewey* v. *United States*, No. 310.   *Stovell* v. *Dewey*, No. 311.

THESE are appeals taken from a decree of the Supreme Court of the District of Columbia, sitting as a District Court of the United States in admiralty, in a suit in prize brought by Admiral Dewey in behalf of himself and the officers and crew of the naval forces on the Asiatic station, taking part in the battle of Manila Bay.

May 1, 1898, Admiral Dewey, being then a Commodore in the United States Navy, with a fleet under his command, engaged a Spanish fleet consisting of the Reina Cristina, Castilla, Don Juan de Austria, Don Antonio de Ulloa, General Lezo, Marques del Duero, Argos, Velasco, Isla de Cuba, Isla de Luzon, Isla de Mindanao, Manila and two torpedo boats, supported by shore batteries, submarine mines and torpedoes. At the close of the battle all these vessels were confessedly destroyed except the Manila, which was captured, and the Don Juan de Austria, Isla de Cuba and Isla de Luzon, in respect of which the facts were these : Under the severe fire of the American fleet they steamed to a position of greater safety, and, after the battle, backed ashore, and when in shallow water their sea valves were opened and they settled on the bottom. They, and other armed vessels, were afterwards set on fire by a detachment from the United States fleet, in obedience to a signal from the flagship when the firing ceased. All captured vessels, not destroyed, were appraised and appropriated to the use of the United States, except one or more private vessels, which were restored to their owners, and not including the Don Juan de Austria, the Isla de Cuba and the Isla de Luzon.

May 3, 1898, Commodore Dewey took possession of the Cavite arsenal, containing a large quantity of naval stores and supplies, and some boats, and he also took possession of certain land batteries. Some of the property taken at the arsenal, besides that taken from the sunken vessels, was included in the appraisement.

The protocol between the United States and Spain, signed August 12, 1898, provided as follows : " The United States will occupy and hold the city, bay and harbor of Manila, pending the conclusion of a treaty of peace, which shall determine the control, disposition and government of the Philippines,

. . . Upon the conclusion and signing of this protocol, hostilities between the two countries shall be suspended."

About the first of September, 1898, an examination was made of the Don Juan de Austria, the Isla de Cuba and the Isla de Luzon, and the commander-in-chief advertised for bids for raising, repairing and fitting them out. In October he contracted, on behalf of the United States, with a' dock company to effect this purpose. The work of raising the vessels was begun on October 29 and finished on November 24. They were then overhauled sufficiently to enable them to proceed to Hong Kong, where they were reconstructed and refitted for use in the United States Navy, of which they became a part.

Full report was made to the Navy Department in July, 1899, of the condition of each of these vessels, upon being raised, and of the progress of reconstruction, including estimates of the value of the vessels when completed, exclusive of armament, and of the cost of raising, fitting out and repairing them. And an appraisement was made in that department of the three vessels when completed, giving the value, and the cost of repairs, from which it also appears that they were first commissioned in the United States Navy in 1900.

Some of the other sunken vessels might probably have been raised to advantage, but no attempt was made to do so, though a small amount of property was taken from them for government use. They were all advertised for sale in September, 1898, but no bids were received.

. Shortly after the battle, the commander-in-chief took possession for government use of some cascoes or cargo boats, and two floating derricks belonging to private parties.

The treaty of peace between the United States and Spain provided : " Stands of colors, uncaptured war vessels, small arms, guns of all calibres, with their carriages and accessories, powder, ammunition, live stock, and materials and supplies of all kinds, belonging to the land and naval forces of Spain in the Philippines and Guam, remain the property of Spain."

By virtue of this provision, so much of the public property captured at the Cavite arsenal, and elsewhere on land, remaining unused at the date of the exchange of ratifications, was subsequently restored to Spain.

Actions were instituted for bounty under section 4635 of the Revised Statutes, on account of all the vessels other than the Don Juan de Austria, the Isla de Cuba, the Isla de Luzon and those enumerated in the appraisement, and bounty has been granted under that section for the destruction of those vessels. *Dewey* v. *United States*, 35 C. Cl. 172 ; *S. C.*, 178 U. S. 510.

July 20, 1899, this libel was filed against the Don Juan de Austria, the Isla de Cuba, the Isla de Luzon ; all the property taken from them and from the sunken vessels ; all the vessels and other property taken afloat, and all the property captured ashore.

The United States filed an answer denying that the Don Juan de Austria, the Isla de Cuba and the Isla de Luzon, the property captured on board of them, the property captured on land, and the cargo boats were subject to condemnation as prize. March 26, 1901, an intervening libel was filed by Edwin F. Stovell, on behalf of himself and the officers and crew of the Nanshan, to which an answer was filed by libellant. The case having been heard, a decree of condemnation and distribution was made November 5, 1901, which adjudged the Isla de Cuba, the Isla de Luzon and the Don Juan de Austria, and the Manila and all other captured vessels named in the appraisement, except such as might have been returned to private owners, and all property captured upon or belonging to any of these vessels, or any vessels sunk or destroyed on May 1, 1898, to be lawful prize of war. All property captured ashore and all non-sea-going craft belonging to the arsenal, as well as all cascoes and the floating derricks not belonging to the King of Spain, were held not to be prize, and as to such property the libel was dismissed. The Nanshan, and the Zafiro, a vessel in the same situation, were held not entitled to share in any of the prize property ; and the hostile fleet was held to have been of inferior force to the vessels making the capture. An appeal was taken by the United States, a cross appeal by libellant, and an appeal by the intervenor.

Errors were assigned :

By the United States, that the District Court erred in holding (1) that the vessels of war raised and reconstructed for the

navy, with guns, munitions, equipment, stores and other articles found upon them, were lawful prize of war for the benefit of the captors; (2) as also guns, munitions, equipment, stores and other articles on board the Spanish vessels of war sunk or otherwise destroyed, and not restored.

By libellant, that the District Court erred in holding (1) that the property captured at the naval station at Cavite was not lawful prize; (2) that the cascoes were not lawful prize.

By the intervenor, in holding that the Nanshan (and with her the Zafiro) was not entitled to share in the prize property.

*Mr. Assistant Attorney General Hoyt* and *Mr. Special Attorney Charles C. Binney* for the United States.

*Mr. Benjamin Micou* for Admiral Dewey and other officers. *Mr. Hilary A. Herbert* was with him on the brief.

*Mr. William B. King* for Rear Admiral Coghlan and others. *Mr. George A. King* was with him on the brief.

*Mr. Charles W. Claggett* and *Mr. Conrad H. Syme* for appellant Stovell.

MR. CHIEF JUSTICE FULLER, after making the foregoing statement, delivered the opinion of the court.

Captures in war enure to the Government and can become private property only by its grant. The right of the citizen to demand condemnation of vessels or property as prize for his benefit must be derived from acts of Congress, and their scope is not to be enlarged in his favor by construction. *The Siren*, 13 Wall. 389. Although in matters of detail, where there is no controversy in respect of the existence of the grant, a more liberal construction may be applied in carrying the intention of Congress into effect.

The correctness of the decree so far as it related to Spanish seagoing vessels with their equipment and the property found

on board of them, captured at the battle or soon afterward, and not restored to their owners, is conceded.

1. The first question to be determined is whether the Don Juan de Austria, the Isla de Cuba, and the Isla de Luzon were properly adjudicated as prize for the benefit of captors in view of their condition immediately after the engagement, and their being subsequently raised, reconstructed, and commissioned in the Navy.

In the consideration of that question we assume that "capture" and "prize" are not convertible terms, and that for the subject of capture to be made prize for the benefit of the captors the taking must meet the conditions imposed by the statutes.

The statutory provisions bearing on the case are to be found in chapter LIV of the Revised Statutes, entitled "Prize," embracing sections 4613 to 4652 inclusive, some of which are given below, together with certain of the "Instructions to Blockading Vessels and Cruisers," issued by General Order, June 20, 1898.[1]

---

[1] "SEC. 4613. The provisions of this title shall apply to all captures made as prize by authority of the United States, or adopted and ratified by the President of the United States."

"SEC. 4615. The commanding officer of any vessel making a capture shall secure the documents of the ship and cargo, including the log book, with all other documents, letters, and other papers found on board, and make an inventory of the same, and seal them up, and send them, with the inventory, to the court in which proceedings are to be had, with a written statement that they are all the papers found, and are in the condition in which they were found; or explaining the absence of any documents or papers, or any change in their condition. He shall also send to such court, as witnesses, the master, one or more of the other officers, the supercargo, purser, or agent of the prize, and any person found on board whom he may suppose to be interested in, or to have knowledge respecting, the title, national character, or destination of the prize. He shall send the prize, with the documents, papers, and witnesses, under charge of a competent prize master and prize crew, into port for adjudication, explaining the absence of any usual witnesses; and in the absence of instructions from superior authority as to the port to which it shall be sent, he shall select such port as he shall deem most convenient, in view of the interest of probable claimants, as well as of the captors. If the captured vessel, or any part of the captured property, is not in condition to be sent in for adjudication, a survey shall be had thereon and an appraisement made by persons as competent and impartial as can be obtained, and their reports shall be sent to the court in which proceedings are to be had; and such property, unless appro-

Ordinarily the property must be brought in for adjudication, as the question is one of title, which does not vest until condemnation, but it will be seen that by section 4615, if the captured vessel, or any part of the captured property, is not in condition to be sent in for adjudication, a survey and appraisement shall be had, the property sold, and the proceeds deposited subject to the order of the court; and by sections 4624 and 4625, captured vessels and property may be appropriated to the use of the United States, and the money value stand in place of the prize. And proceedings may be had where property which might have been brought in has been entirely lost or destroyed. Adjudication is contemplated in all cases.

By section 4635, a bounty is given for each person on board a vessel of the enemy which is "sunk or otherwise destroyed" in an engagement, of $100 if the hostile fleet is of inferior, and of $200 if of equal or superior, force; and $50 for every person on board at the time of such capture, where the vessels

---

priated for the use of the Government, shall be sold by the authority of the commanding officer present, and the proceeds deposited with the Assistant Treasurer of the United States most accessible to such court, and subject to its order in the cause."

" SEC. 4624. Whenever any captured vessel, arms, munitions, or other material are taken for the use of the United States before it comes into the custody of the prize court, it shall be surveyed, appraised, and inventoried, by persons as competent and impartial as can be obtained, and the survey, appraisement, and inventory shall be sent to the court in which proceedings are to be had; and if taken afterward, sufficient notice shall first be given to enable the court to have the property appraised for the protection of the rights of the claimants and captors. In all cases of prize property taken for or appropriated to the use of the Government, the department for whose use it is taken or appropriated shall deposit the value thereof with the Assistant Treasurer of the United States nearest to the place of the session of the court, subject to the order of the court in the cause.

" SEC. 4625. If by reason of the condition of the captured property, or if because the whole has been appropriated to the use of the United States, no part of it has been or can be sent in for adjudication, or if the property has been entirely lost or destroyed, proceedings for adjudication may be commenced in any district the Secretary of the Navy may designate; and in any such case the proceeds of anything sold, or the value of anything taken or appropriated for the use of the United States, shall be deposited with the Assistant Treasurer in or nearest to that district, subject to the order of the court in the cause. If, when no property can be sent in for

Opinion of the Court.

taken are immediately destroyed in the public interest but not in consequence of injuries received in action.

This bounty is to be divided in the same manner as prize money, and the prize money in the one case and the bounty in the other cover the entire results of success.

We agree with counsel for libellant that the words " sunk or otherwise destroyed " are equivalent to " destroyed by sinking or otherwise." There are two general classes then under the statute, vessels destroyed, and vessels captured and condemned, or appropriated.

The facts before us are somewhat peculiar and serve to illustrate the variant circumstances that may occur in naval engagements, and create modifications of the general classification. These vessels were run ashore and sunk by their own commanders, with the result that they were only temporarily disabled, and the commanding officer of our fleet, in the public interest, as the engagement closed, directed their destruction to be com-

---

adjudication, the Secretary of the Navy shall not, within three months after any capture, designate a district for the institution of proceedings, the captors may institute proceedings for adjudication in any district. And if in any case of capture no proceedings for adjudication are commenced within a reasonable time, any parties claiming the captured property may, in any District Court as a court of prize, move for a monition to show cause why such proceedings shall not be commenced, or institute an original suit in such court for restitution, and the monition issued in either case shall be served on the attorney of the United States for the district, and on the Secretary of the Navy, as well as on such other persons as the court shall order to be notified."

"Sec. 4630. The net proceeds of all property condemned as prize, shall, when the prize was of superior or equal force to the vessel or vessels making the capture, be decreed to the captors; and when of inferior force, one half shall be decreed to the United States and the other half to the captors, except that in case of privateers and letters of marque, the whole shall be decreed to the captors, unless it shall be otherwise provided in the commissions issued to such vessels."

"Sec. 4634. Whenever a decree of condemnation is rendered, the court shall consider the claims of all vessels to participate in the proceeds, and for that purpose shall, at as early a stage of the cause as possible, order testimony to be taken tending to show what part should be awarded to the captors, and what vessels are entitled to share; and such testimony may be sworn to before any judge or commissioner of the courts of the United States, consul or commercial agent of the United States, or notary public.

pleted by burning. In the report of the action, dated May 4, 1898, they were included among the vessels reported as burnt, but they were not included in the appraisement made by the board of appraisal and survey ordered in accordance with section 4624, and following, of the Revised Statutes, to survey, appraise and take a careful inventory of "enemy's property captured and appropriated for the uses of the United States Government." After hostilities were suspended an examination of the wrecks of the Don Juan de Austria, the Isla de Cuba and the Isla de Luzon was made, and subsequently the vessels were raised, under a contract entered into by the commander-in-chief for the Government, and reconstructed. If the vessels had not been raised and saved, they would have remained abandoned as destroyed, but as they were saved and appropriated by the Government, they cannot be said in fact to fall within that category. We attach no importance to the official reports referring to the vessels as destroyed, which was true in the

---

or any officer of the Navy highest in rank, reasonably accessible to the deponent. The court shall make a decree of distribution, determining what vessels are entitled to share in the prize, and whether the prize was of superior, equal, or inferior force to the vessel or vessels making the capture. The decree shall recite the amount of the gross proceeds of the prize subject to the order of the court, and the amount deducted therefrom for costs and expenses, and the amount remaining for distribution; and whether the whole of such residue is to go to the captors, or one half to the captors and one half to the United States.

"SEC. 4635. A bounty shall be paid by the United States for each person on board any ship or vessel of war belonging to an enemy at the commencement of an engagement, which is sunk or otherwise destroyed in such engagement by any ship or vessel belonging to the United States or which it may be necessary to destroy in consequence of injuries sustained in action, of one hundred dollars, if the enemy's vessel was of inferior force, and of two hundred dollars, if of equal or superior force, to be divided among the officers and crew in the same manner as prize money; and when the actual number of men on board any such vessel cannot be satisfactorily ascertained, it shall be estimated according to the complement allowed to vessels of its class in the Navy of the United States; and there shall be paid as bounty to the captors of any vessel of war captured from an enemy, which they may be instructed to destroy, or which is immediately destroyed for the public interest, but not in consequence of injuries received in action, fifty dollars for every person who shall be on board at the time of such capture."

sense in which the word was then used, for the question really is whether, when salvage had been effected, the Government can maintain that the captors did not take them, but that they were destroyed so that they could not be treated as prize.

The position of the Government is that as these vessels were sunk, and destroyed to such an extent that libellant's naval force was powerless to salve them by its own resources, their subsequent reconstruction and appropriation by the Government had no effect on their legal status, which had been determined immediately after the battle.

It is insisted that if not prize then they could not be prize afterwards, and yet it is not denied that when the question of title is settled by decree it takes effect by relation as of the date of the capture. And because this is so the fact that hostilities had ceased before the vessels were raised becomes immaterial.

The contention is that if a vessel lies on the bottom in shallow water, but in such a condition that she cannot be floated

---

Instructions:

"20. Prizes should be sent in for adjudication, unless otherwise directed, to the nearest home port, in which a prize court may be sitting.

"21. The prize should be delivered to the court as nearly as possible in the condition in which she was at the time of seizure; and to this end her papers should be sealed at the time of seizure and kept in the custody of the prize master. Attention is called to articles Nos. 16 and 17 for the government of the United States Navy. (Exhibit A.)

"22. All witnesses, whose testimony is necessary to the adjudication of the prize, should be detained and sent in with her, and, if circumstances permit, it is preferable that the officer making the search should act as prize master.

"23. As to the delivery of the prize to the judicial authority, consult sections 4615, 4616, and 4617, Revised Statutes of 1878. (Exhibit B.) The papers, including the log book of the prize, are delivered to the prize commissioners; the witnesses, to the custody of the United States marshal; and the prize itself remains in the custody of the prize master until the court issues process directing one of its own officers to take charge.

"24. The title to property seized as prize changes only by the decision rendered by the prize court. But, if the vessel itself, or its cargo, is needed for immediate public use, it may be converted to such use, a careful inventory and appraisal being made by impartial persons and certified to the prize court."

by any of the means ordinarily possessed by a naval force, such vessel must be regarded as "sunk" within the meaning of the statute, even though she has received no structural injury; or if a vessel, though not sunk, be so structurally injured as to destroy her power of floating and she cannot be repaired by any means possessed by the naval forces in the place where she lies, such vessel must be regarded as structurally "destroyed" within the meaning of the statute.

And it is said that a close analogy is furnished by the cases of constructive total loss of a vessel, such as justifies an abandonment to the underwriters. Nevertheless counsel argues that there are differences between those cases and cases under section 4635. Thus, while it is admitted that in the former the owner need not abandon unless he see fit to do so, the right of election on the part of captors as to whether the vessel should be treated as destroyed or as a prize is denied in the latter; and another difference suggested is that the owner of a submerged or stranded vessel could contract with a third party to

---

"28. If there are controlling reasons why vessels may not be sent in for adjudication, as unseaworthiness, the existence of infectious disease, or the lack of a prize crew, they may be appraised and sold; and if this cannot be done they may be destroyed. The imminent danger of recapture would justify destruction, if there was no doubt that the vessel was good prize. But, in all such cases, all the papers and other testimony should be sent to the prize court, in order that a decree may be duly entered."

"*Exhibit A.*

"ART. 16. No person in the Navy shall take out of a prize, or vessel seized as a prize, any money, plate, goods, or any part of her equipment, unless it be for the better preservation thereof, or unless such articles are absolutely needed for the use of any of the vessels or armed forces of the United States, before the same are adjudged lawful prize by a competent court; but the whole, without fraud, concealment, or embezzlement, shall be brought in, in order that judgment may be passed thereon; and every person who offends against this article shall be punished as a court martial may direct.

"ART. 17. If any person in the Navy strips off the clothes of, or pillages, or in manner maltreats, any person taken on board a prize, he shall suffer such punishment as a court martial may adjudge.

"*Exhibit B.*"

[Sections 4615, 4616 and 4617 Rev. Stat.]

raise it, while captors cannot. We think, however, that the alleged differences destroy the analogy altogether, or rather that its application when correctly stated leads to the opposite result. Abandonment rests on the election of the parties, and there was here neither a right of abandonment nor any acts from which abandonment on the one side and acceptance on the other could be fairly inferred.

The public interest required the United States and the captors to preserve the property, if that were possible ; and it would be an anomalous conclusion to hold *in invitum* that the United States could pay bounty for these vessels as destroyed and at the same time retain and use them.

The vessels were not derelict, abandoned without hope of recovery, and on the contrary their preservation was recommended, and, in the circumstances, Commodore Dewey having duly taken the steps prescribed by the statute in respect of vessels confessedly captured, was not obliged to determine at once at his peril into which class these particular vessels fell and to literally comply with section 4615 in regard to captured property " not in condition to be sent in for adjudication."

War is not waged for predatory purposes, but Congress chose to grant reward for success, and in doing so cannot be assumed to have intended that such reward should be subjected to the restrictions of close bargains. The intention was that either prize money or bounty should be paid. Of course, by capture without destruction the Government might obtain distinct acquisitions, and the captors would be recompensed at the expense of the enemy.

Circumstances have frequently occurred in which the public interest has required the destruction of vessels capable in themselves of being brought in, as, for example, at the battle of the Nile, when Nelson was obliged to burn prizes in order to avoid the delay in refitting them, and the loss of the service of other ships to convoy them to Gibraltar ; but there his government could not assist him, or take the captured vessels off his hands.

Section 4635 provided that bounty should be paid in all cases where an enemy vessel of war was sunk or otherwise destroyed, either in an engagment, or in consequence of injuries received

in action, or after capture when the destruction was for the public interest; but the statute does not demand the construction that every vessel must be considered as destroyed, which, though susceptible of salvage and saved, could not have been, and was not saved, by the unaided resources of the capturing force.

It is true that when the Government succeeded in raising and restoring the vessels it saved them for itself, but it may reasonably be held that this was subject by relation to the right of the captors to an adjudication giving them, after the costs and expenses were deducted, a share in the residue of value.

If the effort at salvage had failed, or if the cost had equaled or exceeded the value, the captors would still be entitled to bounty, for it was not intended that the grant should be defeated by laying them under a rigid rule of election. And on the other hand these vessels were not "appropriated to the use of the United States" by the mere effort of the Government to raise them.

The act of raising was not the use contemplated by the statute. Such use was dependent on the success of the effort at salvage. The loss which might have been total, became on success partial, that is, confined to the extent of the expenditure, and the taking possession to accomplish that result, became by success appropriation to use.

The case of the Albemarle is in point, although apparently no opinion ruled the question in terms.

The Albemarle was sunk by Lieutenant Cushing on the night of October 27, 1864; was raised in March, 1865; reached Norfolk, April 27, 1865, and was appropriated to the use of the United States. She was appraised by a duly appointed board of naval officers and the value found was deposited by the Secretary of the Navy with the Assistant Treasurer of the United States at Washington. Proceedings to condemn the Albemarle as prize were instituted in the District Court of the United States for the District of Columbia and went to a decree of condemnation. The case was not reported, but the proceedings will be found in *Swan* v. *United States*, 19 C. Cl. 51, in the course of subsequent litigation; as also in *United States* v. *Steever*, 113 U. S. 747. No appeal was taken, and the conclusion that a

vessel thus situated could be decreed to be prize was accepted by all the Departments. We perceive no adequate reason to depart from that precedent.

2. As to the property taken from the vessels raised and reconstructed, and that taken from the vessels destroyed, we think its legal status must be regarded as the same as that of the vessel to which it belonged.

By section 4613 it is declared that the provisions of Title LIV shall apply to "all captures made as prize by authority of the United States, or adopted and ratified by the President of the United States."

The taking must be under such conditions as make the subject of the capture prize, and the sections preceding section 4635 recognize that property other than vessels may be prize, using the words "ship and cargo," "vessel, arms, munitions or other material," "captured property," "prize property." But section 4635 refers to the destruction of a "ship or vessel of war," which could not be "sunk or otherwise destroyed" under that section, and be "prize" under the preceding sections, and as we have already said the grant of bounty to be divided "in the same manner as prize money," appears obviously to have been "intended as a substitute for the prize itself," as ruled by Lowell, J., in *The Selma*, 1 Lowell, 30, or as given in lieu of prize money, as observed by Mr. Justice Field, in *Porter* v. *United States*, 106 U. S. 607.

No question of cargo is involved. Cargo is the lading of a ship or vessel, and may be prize when the vessel is not, or the vessel may be, when the cargo is not. The inquiry here relates to things belonging to the outfit of vessels of war, for whose capture prize money is paid, and for whose destruction bounty is paid. The injury to the enemy is the same in either case, but the reward cannot be the same, as it is arbitrary in the one case, and not in the other, and arrived at in accordance with the general rules prescribed as required by the circumstances. The statute did not contemplate a division of the grant and an award of prize money and bounty in respect of the same transaction, unless, indeed, the capture embraced distinct and separate properties.

What is included then by the term a " ship or vessel of war " under section 4635 ?    Whatever the toleration extended in courts of admiralty to the use, in practice, of words apparently superfluous, the word " ship " embraces her boats, tackle, apparel and appurtenances because part of the ship as a going concern, and, for the same reason, " ship or vessel of war " includes her armament, search lights, stores, everything, in short, attached to or on board the ship in aid of her operations.

The first Congressional legislation regulating prize was the act of March 2, 1799, 1 Stat. 715, c. 24, providing:

" SEC. 5. *And be it further enacted*, That all captured national ships or vessels of war shall be the property of the United States—all other ships or vessels, being of superior force to the vessel making the capture, in men or in guns, shall be the sole property of the captors—and all ships or vessels of inferior force shall be divided equally between the United States and the officers and men of the vessel making the capture.

" SEC. 6. *And be it further enacted*, That the produce of prizes taken by the ships of the United States, and bounty for taking the ships of the enemy, be proportioned and distributed in the manner following, to wit:

[Then followed twelve subdivisions in respect of the distribution of prize money.]

" 13.  The bounty given by the United States on any national ship of war, taken from the enemy and brought into port, shall be for every cannon mounted, carrying a ball of twenty-four pounds, or upwards, two hundred dollars; for every cannon carrying a ball of eighteen pounds, one hundred and fifty dollars ; for every cannon carrying a ball of twelve pounds, one hundred dollars ; and for every cannon carrying a ball of nine pounds, seventy-five dollars ; for every smaller cannon, fifty dollars ; and for every officer and man taken on board, forty dollars ; which sums are to be divided agreeably to the foregoing articles."

These sections admit of no other meaning than that the tackle, sails, apparel, stores, guns, ammunition and other appurtenances of captured national vessels of war should be the property of the United States, as well as the ships themselves, and so of ships or vessels going to the captors.

And the acts of April 23, 1800 ; July 17, 1862 ; June 30, 1864, and the Revised Statutes, contain nothing inconsistent with that view.

Parsons, in his work on Marine Insurance, says that "insurance on the ship covers all that belongs to it, as hull, sails, rigging, tackle, apparel, or furniture ;" and he quotes from Emerigon, c. 10, § 2, p. 234 : "The expression, 'on the body,' embraces in its generality, as I have just said, all that regards the ship. Such are the hull of the vessel, its rigging and apparel, munitions of war, stores and victualling, advances to the crew, and all that has been expended in the fitting it out." 1 Marine Ins. 524.

And in his work on Shipping and Admiralty, vol. 1, p. 78, the same author says : "How much passes by the word 'ship,' or the phrase 'ship and her appurtenances,—or apparel,—or furniture,'—or the like, cannot be positively determined by any definition. Stowell and Abbott agree, that whatever is on board a ship for the objects of the voyage and adventure in which she is engaged, belonging to the owners, constitutes a part of the ship and her appurtenances, within the meaning of the English statute of 53 Geo. 3, c. 159."

That was an act " to limit the responsibility of shipowners," and provided that owners should not be liable " further than the value of his or their ship or vessel, and the freight due or to grow due," and in several clauses of the act the responsibility was referred to as limited " to the value of the ship with all her appurtenances and freight."

In *The Dundee*, 1 Hagg. 109, the question arose whether the value of certain fishing stores should be included. Lord Stowell held that it should, and that the word " appurtenances," distinguished between cargo, which was intended to be disposed of at the foreign port, and having a merely transitory connection with the ship, and those accompaniments that were indispensable instruments without which the ship could not perform its functions. The owners declared in prohibition in the King's Bench, *Gale* v. *Laurie*, 5 B. & C. 156, and Abbott, C. J., afterwards Lord Tenterden, announced the same conclusion, and, among other things, said : " The fishing stores were not

carried on board the ship as merchandise, but for the accomplishment of the objects of the voyage; and we think, that whatever is on board a ship for the object of the voyage and adventure on which she is engaged, belonging to the owners, constitutes a part of the ship and her appurtenances within the meaning of this act, whether the object be warfare, the conveyance of passengers, or goods, or the fishery. This construction furnishes a plain and intelligible general rule; whereas if it should be held that nothing is to be considered as part of the ship that is not necessary for her navigation or motion on the water, a door would be opened to many nice questions, and much discussion and cavil."

In *The Witch Queen*, 3 Sawy. 201, Judge Hoffman held that, where a vessel was supplied with a diving bell, air pump, and other apparatus for the accomplishment of the enterprise in which she was about to engage, the lien of the materialmen extended to all articles belonging to the owner, which, not being cargo, had been placed on board for the objects and purposes of the voyage. The decision proceeded on our eighth rule in admiralty, referring to " suits *in rem* against a ship, her tackle, sails, apparel, furniture, boats, or other appurtenances "; and *The Dundee*, decided twenty years before the adoption of the rule, was cited as showing the sense in which the term " appurtenances " had been used.

To be sure, the words tackle, sails, apparel, boats, appurtenances, are not used in Title LIV, but we think that such minuteness was unnecessary, and that the words " ship or vessel of war belonging to the enemy " are sufficiently comprehensive to embrace not only everything essential to the ship's navigation, but to the purposes of her existence.

Necessarily there is nothing in the distinction attempted to be drawn between the ship and her " appliances and outfit," nor can we concur in the view that the latter may be regarded as cargo in any aspect.

It is said that the destroyed hostile vessel of war should be held the subject of bounty, and property taken from her the subject of prize money because bounty alone would be an inadequate reward.

This, even if true, would not justify us in attributing to the statute a scope not permitted by its terms.

Section 4635 is couched in the same language as when enacted July 17, 1862, after the battle between the Monitor and the Merrimac had admonished us of the impending change in the construction of vessels of war, yet the bounty provision was reënacted in 1864, and incorporated into the Revised Statutes, and while in these days the amount of bounty may seem inconsiderable in comparison with the value of the vessel destroyed, we must take the statute as we find it.

3. The battle of Manila was fought on the first day of May, and on the third, the enemy's forces evacuated the Cavite arsenal, which was taken possession of by a landing party. This naval station contained a considerable amount of arms, munitions and material, for the repairing, equipment and fitting out of ships, and some non-seagoing boats were in use there. The property was appraised in due course; some of it was used in the Navy prior to the exchange of ratifications of the treaty of peace; and the remainder restored to Spain thereafter. The District Court declined to adjudicate this property to be prize because captured on land.

These were naval stores taken at a naval station, by a naval force, as the result of a naval engagement, and the question is whether the fact that they were taken from a navy yard instead of from a vessel rendered the statute inapplicable.

Generally speaking, forts, cities, lands taken from the enemy, are called conquests; movables taken on land, booty; on the high seas, prize. And the high seas include coast waters without the boundaries of low water mark, though within bays or roadsteads—waters on which a court of admiralty has jurisdiction. *United States* v. *Ross*, 1 Gall. 624.

Mr. Justice Story and Mr. Wheaton thought that the jurisdiction in prize extended " as well to goods taken on land by a naval force, or in consequence of the operations of a naval force, as to property captured on the water." Wheaton on Captures, 278; Pratt's Story's Notes on Prize Courts, 28; 2 Wheat. Appx. 1. Both these learned authors cite English authorities, and among them the leading case of *Lindo* v. *Rodney*, 2 Douglas, 613, note.

In that case the property was captured on the island of St. Eustatius, and a writ of prohibition to restrain the prize court was applied for. It was stated that the only question was " whether the goods being taken on land, though in consequence of a surrender to ships at sea, excludes the only prize jurisdiction known in this kingdom." The question was answered in the negative in an elaborate opinion and the rule discharged. Lord Mansfield, among other things, said : " In short, every reason which created a prize court as to things taken upon the high seas, holds equally when they are *thus* taken at land. The original cause of taking is here at sea. The force which terrified the place into a surrender was at sea. If they had resisted, the force to subdue would have been from the sea. Mr. Piggott candidly said, it would be spinning very nicely, to contend, if the enemy left their ship, and got ashore with money, were followed upon land, and stripped of their money, that this would not be a sea capture. I agree with him, but I cannot distinguish that case from this. Both takings are literally upon land. In both, the prey is, as it were, killed at sea, and taken upon land. Here the capture of the goods on land is the immediate consequence of the surrender at discretion to a sea force. Would a sum paid by capitulation upon land have made it a sea or a land prize ? *Cui bono* should all this subtilty be spun, when the reason for a jurisdiction to judge a capture at sea and such a capture at land is exactly the same ? "

This reasoning shows that even though the general proposition may have been stated somewhat broadly by Story and Wheaton, circumstances may bring particular cases within it, and that mere contact with land does not *ipso facto* exclude jurisdiction in prize.

In *The Siren*, 13 Wall. 389, 392, Mr. Justice Swayne, speaking for the court, said: " While the American Colonies were a part of the British Empire, the English maritime law, including the law of prize, was the maritime law of this country. From the close of the Revolution down to this time it has continued to be our law, so far as it is adapted to the altered circumstances and condition of the country, and has not been modified by the proper national authorities."

It was there decided that a seagoing vessel captured by the Army and Navy jointly was not subject of condemnation as prize, and that only captures made by naval force alone were so subject. "Whenever a claim is set up," said the court, "its sanction by an act of Congress must be shown. If no such act can be produced the alleged right does not exist."

Hence captures are made as prize for the benefit of captors when they come within the scope of our prize statutes, and not otherwise.

In *The Emulous*, 1 Gall. 563, 575, Mr. Justice Story said: "The admiralty, therefore, not only takes cognizance of all captures made at sea, in creeks, havens, and rivers, but also of all captures made on land where the same have been made by a naval force, or by coöperation with a naval force. This exercise of jurisdiction is settled by the most solemn adjudications."

The decree in *The Emulous* was reversed in *Brown* v. *United States*, 8 Cranch, 110, but that was on the ground of the unlawfulness of the taking, and so referred to by Mr. Justice Gray, in *The Paquete Habana*, 175 U. S. 667, 711.

In *United States* v. *269½ Bales of Cotton*, Woolworth, 236, an officer of the Army embarked a battalion of cavalry on vessels of the United States, and in the service of the Government, but not part of the naval force, and proceeding by river and by land penetrated into a certain district of Mississippi then held by the enemy, and by force of arms overpowered a body of hostile troops and took from their possession 269½ bales of cotton, which were subsequently libelled. And Mr. Justice Miller, on circuit, held that the cotton was captured by the Army and not by the Navy, and dismissed the libel. While Mr. Justice Miller there remarked that the result of *Brown* v. *United States*, was "that property on land is not, without the aid of the statute, liable to capture and condemnation as prize of war," yet after considering many English cases at some length, and referring to *The Emulous*, and the case of *Six Hundred and Eighty Pieces Merchandise*, 2 Sprague, 233, he said: "In every one of the cases where the court has sustained its jurisdiction in prize, it appears that the force making the capture, or coöperating in the act, was the naval arm, or, by its presence and active assistance, it

contributed immediately in effecting the capture; that it operated from the sea; that the place captured was an island; town, or fortress, itself established to resist naval attack, and to support and succor naval expeditions, and accessible from the sea, so that the attacking squadron could directly bring to bear upon it the stress of its armament." And, referring to property captured on land by land forces, he added: "However desirable it may be that, in a war between nations, there should exist a tribunal similar to the prize court, to administer the law of nations with reference to property captured on land, we find no warrant for asserting that any such authority exists in the admiralty courts of the United States, unless the circumstances of the capture show some element of a force operating from, or on, the water, which would bring it within the recognized rules on that subject."

In the case of *Mrs. Alexander's Cotton*, 2 Wall. 404, a joint expedition of gunboats under Rear Admiral Porter and a body of troops under Major General Banks proceeded up the Red River, and, during its advance, seventy-two bales of cotton, the private property of Mrs. Alexander, were taken from her plantation, where they were stored in a cotton-gin house about a mile from the river, by a party from one of the gunboats. The cotton was hauled by teams to the river bank, sent to Cairo, libelled as prize of war in the District Court for the Southern District of Illinois, May 18, 1864; claimed by Mrs. Alexander; sold *pendente lite*, and the proceeds decreed to her. The United States appealed and asked the reversal of the decree and the condemnation of the cotton as maritime prize. This court held that the capture was justified by legislation and by public policy, but that the property was not maritime prize; that there was no authority to condemn any property as prize for the benefit of the captors except under the act of July 17, 1862, 12 Stat. 600, c. 204; and that as the second section of that act provided that "the proceeds of all ships and vessels, and the goods taken on board of them, which shall be adjudged good prize," should be the property of the captors, in whole or in part, property on land was excluded from the category of prize for the benefit of captors, and that this was decisive of the case

so far as claims of captors were concerned. The decree was reversed and the cause remanded with directions to dismiss the libel.

In that case the capture was the result of a joint expedition; the property was private property; unprotected and stored at a distance from the river; valuable for domestic use, and so valuable as to be of peculiar assistance to the enemy, but not in any sense war material.

In the present case the capture was made by naval force alone; the property was public property, consisting of arms, munitions and naval material; in a naval station taken through the operations of the fleet from the sea.

For the reasons indicated by Mr. Justice Miller, in harmony with the observations of Lord Mansfield, the rulings in that case and in *The Siren* are not controlling in this, and, moreover, the terms of the applicable statute are not the same.

The sections constituting Title LIV of the Revised Statutes were brought forward from the act of June 30, 1864, 13 Stat. 306, c. 174.

Section 2 of the act of July 17, 1862, referred to by Mr. Chief Justice Chase in the case of *Mrs. Alexander's Cotton*, reads as follows: "That the proceeds of all ships and vessels, and the goods taken on board of them, which shall be adjudged good prize, shall, when of equal or superior force to the vessel or vessels making the capture, be the sole property of the captors; and when of inferior force, shall be divided equally between the United States and the officers and men making the capture."

This section was identical with section 5 of the act of April 23, 1800, and was expressly repealed by section 35 of the act of June 30, 1864, while section 10 of the latter act, afterwards section 4630 of the Revised Statutes, provided: "That the net proceeds of all property condemned as prize shall, when the prize was of superior or equal force to the vessel or vessels making the capture, be decreed to the captors; and when of inferior force, one half shall be decreed to the United States and the other half to the captors;" and section 33: "That the provisions of this act shall be applied to all captures made as prize by authority of the United States, or adopted and ratified

by the President of the United States;" which was reënacted as section 4613 of the Revised Statutes.

The effect of this legislation was not to revive section 5 of the act of 1800 as contended, nor to give jurisdiction in admiralty in respect of property captured on land by land forces, but if the language of the act of 1862 confined the rights of captors to the proceeds of ships and cargoes, it seems clear that the language of the act of 1864, that the captors should be entitled to "the net proceeds of all property condemned as prize," operated to so far remove the restriction as to permit the statute to extend to other property fairly coming within accepted rules of prize.

The District Court thought the words inadequate to produce this result, and carefully examined other sections of the act of 1864, which referred to vessels and cargoes as the usual subjects of prize. But we should remember that that statute, and Title LIV, into which it was carried, embraced prize in general, and that vessels and their cargoes most frequently constituted prize property brought in for adjudication. So that in making provision in that regard, Congress was obliged to use such terms as even to give color to the argument that enemy's vessels of war could not be condemned at all for the benefit of captors, and that bounty was their only reward, as was the case under the act of 1799. But it is conceded that this is not so, and we think that these sections ought not to be given the restrictive force attributed to them.

We are also unable to see that the significance of the change in phraseology is lessened when considered with the other legislation referred to.

The act of March 12, 1863, 12 Stat. 820, c. 120, provided for the collection of all abandoned or captured property in insurrectionary districts, and "that such property shall not include any kind or description which has been used, or which was intended to be used, for waging or carrying on war against the United States, such as arms, ordnance, ships, steamboats, or other water craft, and the furniture, forage, military supplies, or munitions of war." Section 7 read: "That none of the provisions of this act shall apply to any lawful maritime prize by

the naval forces of the United States." The property excepted had been declared " lawful subject of prize and capture wherever found;" and it was made the duty of the President " to cause the same to be seized, confiscated, and condemned," by the confiscation act of August 6, 1861, 12 Stat. 319, c. 60. This act referred to property taken when used, or intended to be used, in waging war against the United States, while the act of 1863 referred to property not so used or intended to be.

By the second section of the act of March 3, 1863, " further to regulate proceedings in prize cases," 12 Stat. 759, c. 86, it was provided that " any captured vessel, any arms or munitions of war, or other material," might be taken " for the use of the Government," and the value deposited in the Treasury of the United States, and for prize proceedings. This act was expressly repealed by section 35 of the act of June 30, 1864, section 10 of which act, as already seen, provided that the captors might share in the net proceeds of all property condemned as prize.

Section 7 of the act of July 2, 1864, 13 Stat. 377, c. 225, reads: " That no property seized or taken upon any of the inland waters of the United States by the naval forces thereof, shall be regarded as maritime prize; but all property so seized or taken shall be promptly delivered to the proper officers of the courts, or as provided in this act and in the said act approved March twelve, eighteen hundred and sixty-three." These various acts growing out of the civil war cannot be regarded as having any important bearing on the act of June 30, 1864, and Title LIV, in so far as the particular modification of the act of 1862 is concerned.

And neither these acts, nor sections 5308 to 5311, in respect of insurrection, and par. 9 of section 563, and par. 6 of section 629, Revised Statutes, affect the result we have reached.

In our opinion it would be spinning altogether too nicely to hold that because enemy property on land cannot be taken in prize by land operations, public property designed for hostile uses, and stored on the sea shore in an establishment for facilitating naval warfare, might not be made prize, under the statute, when captured by naval forces operating directly from the sea.

But while the property in question was in general susceptible of condemnation in prize, it was nevertheless taken subject to the exercise of the power of restitution. The right of the Government is supreme, and when in its judgment the public interest demands it, prizes may be restored, and the courts cannot proceed to condemnation.

In *The Elsebe*, 5 Rob. 155, Lord Stowell, then Sir William Scott, decided that up to the period of final condemnation, the Crown can, by virtue of its prerogative, restore a prize to the enemy from whom it has been captured, and may take this step without consulting the captors.

The principle is fully discussed and sustained by unanswerable reasoning, and is not shaken by his subsequent observations in *The St. Ivan*, Edw. 376, that "captors bring in their prizes subject to such interposition on the part of the Crown; but it is of very rare occurrence, and speaking with all due reverence ought to be of rare occurrence, and only under very special circumstances; as, for instance, where the detention of the vessel may be detrimental to the general interests of the country."

Until condemnation captors acquire no absolute right of property in a prize, though then the right attaches as of the time of the capture, and it is for the Government to determine when the public interests require a different destination. In respect of whatever was restored under the treaty with Spain the Government must be regarded as absolved from liability.

It further follows from the views we entertain as justifying condemnation of a portion of this property, that the capturing naval force must be held to have been superior within the contemplation of the statute, according to previous decision.

4. The libel was amended some months after it was filed so as to cover certain cascoes or small native boats, and also two floating derricks or wrecking boats, the property of private citizens residing in the Philippine Islands. These cascoes appear to have been large barges, propelled by sweeps and by poling, of from thirty to sixty tons capacity, of the value of from $1500 to $1800, Mexican, each, and used in discharging cargoes. The wrecking boats were flat boats, the largest being forty feet long and fifteen feet broad. They had no means of propulsion, were

not seagoing boats in any sense, and could only be used in com-
paratively smooth water. All these boats may have been the
private property of Filipinos, but that is not clear.

It may well be doubted if these craft came within the words
ship or vessel as used in Title LIV. Whether in the circum-
stances they could justly be treated as technically enemy prop-
erty, is a question not so presented as to require discussion.
They were put to public use by the commanding officer, but
what ultimately became of them does not appear from the rec-
ord. If restitution was made, they have ceased to be within
the jurisdiction. And in any view, we are of opinion that they
came within the considerations set forth in *The Paquete Ha-
bana*, 175 U. S. 677; and that the District Court rightly held
that they were not subject to condemnation.

We are of opinion that the District Court committed no error
in its decree in respect of the Don Juan de Austria, the Isla de
Cuba and the Isla de Luzon, and the property taken from them,
as well as the vessels captured and their appurtenances; or in
respect of the lighters and wrecking boats; but that a share in
a portion of the naval stores and material captured in the Cavite
arsenal, and the boats pertaining thereto, should have been
awarded; and that the decree should not have included prop-
erty taken from vessels sunk and destroyed.

And this brings us to consider:

5. The decree dismissing the intervention of Stovell.

This was an intervening libel filed by Edward F. Stovell as
captain of the Nanshan, on behalf of its officers and crew, as
well as himself, seeking to participate in the prize money that
might be awarded on the main libel. Stovell had previously
made an application in the Court of Claims to participate in
the bounty awarded for vessels destroyed under section 4635
of the Revised Statutes, which was dismissed by that court.
36 C. Cl. 392.

The record in the Court of Claims was made the record in
the District Court on the intervention of Stovell, and forms part
of the record on this appeal. The facts are correctly summa-
rized by Weldon, J., in the opinion of the Court of Claims, as
follows:

"The facts found by the court show that the claimant was captain or master of the original crew of the Nanshan, which was a British merchant vessel, purchased by Admiral Dewey at Hong Kong, under authority of the Secretary of the Navy, in April, 1898. The vessel was not commissioned, but was registered as an American-steamer, and the original crew was shipped in the American merchant service. The crew were employed to handle the ship, and the officers and men were promised and received double the wages they had theretofore been paid in the British merchant service. They were not rated in the United States Navy, and the double wages were not the rates of pay fixed by the President under authority of Revised Statutes, section 1564. The arrangement as to the employment and payment of the crew was the result of an agreement made by Admiral Dewey with the original officers of the Nanshan. A monthly list of the names and wages of the crew, in Mexican money, was made by the original captain or master, the aggregate amount of which was received by him from the pay inspector of the fleet in a lump sum, reduced to the value of American gold, which money the captain distributed to his original crew.

"Admiral Dewey placed on board a naval officer, Lieut. Benj. W. Hodges, and four enlisted men, and two mounted 1-pounder guns. The master of the Nanshan, Capt. Edwin F. Stovell, remained on board, and under him were shipped the seamen, as aforesaid. The naval officer exercised control over the vessel and gave all orders concerning her. The merchant captain was merely his executive officer, being familiar with the crew. The Nanshan did not approach the Spanish fleet during the battle of Manila near enough to enable her to be of any service. The guns were mounted on her as a protection from boat attacks, but not for offensive operations. At the time and during the battle of Manila, Lieut. Benj. W. Hodges had been detailed as aforesaid with four men of the Navy for duty on said vessel, and was so engaged on said vessel as above stated at and during the time of the battle. The Nanshan was loaded with 3000 tons of coal. The Raleigh was detailed as a special guard in case the reserve division was attacked separately by the enemy.

The duty of the naval captain on said ship was to take general charge of the vessel, execute all orders from the flagship controlling the movements of the Nanshan, the handling of the guns, and the signaling, but not to interfere with the internal management and discipline of the ship and such things as loading and discharging cargo.

"After the vessel was bought by Admiral Dewey, the Nanshan crossed the China Sea with the fleet and was a part thereof. She kept her position in the fleet. After the fleet stopped at Subig Bay the Admiral ordered her commander to come on board the flagship for his final orders, afterwards returning to the Nanshan. The fleet started in single column, the Olympia leading, followed by the Baltimore, the Raleigh, the Petrel, the Concord, the Boston, the McCullough, the Nanshan, and Zafiro, passing the forts in that order. The forts on the south side of the channel fired upon the fleet as they were entering Manila Bay, and the Nanshan passed through that fire. The Nanshan was in reserve during the action, within signaling distance. She had on board two 1-pounders, taken from the Olympia, with 360 rounds of ammunition for those guns; also 11 rifles from the Raleigh and 11 revolvers, with a suitable amount of ammunition, and two boats rigged ready to lower to pick up men if it was found necessary to do so. The Nanshan was a heavy ship, being loaded to the underwriters' mark with coal.

"At the time and during the battle of Manila the Nanshan was between 4 and 5 miles of the Spanish fleet engaged in that action. She was within signaling distance of the fleet that effected the destruction of the Spanish vessels, but was not in such condition as to afford effective aid, her guns not being able to produce any effect upon the Spanish vessels; she was ordered to lay off in the bay, clear of the fleet; she could not have been brought within effective range, because her guns were too light."

Section 4614 provides: "The term 'vessels of the Navy,' as used in this Title, shall include all armed vessels officered and manned by the United States, and under the control of the Department of the Navy."

Section 4632: "All vessels of the Navy within signal dis-

tance of the vessel or vessels making the capture, under such circumstances and in such condition as to be able to render effective aid, if required, shall share in the prize ; and in case of vessels not in the Navy, none shall be entitled to share except the vessel or vessels making the capture ; in which term shall be included vessels present at and rendering actual assistance in the capture."

The Court of Claims held on the facts that the Nanshan was not at the time of the battle of Manila in such a condition as to enable her to render effective aid, if required ; that she was performing the functions of a collier, to be protected instead of to act aggressively ; that her crew had never been enlisted in the Navy, but had been employed simply to perform manual labor ; that the two 1-pounders and the small arms she had on board were for purposes of defence rather than attack ; that " she was not kept in the relation which she sustained to the engagement for strategic purposes, but for the purpose of protection to herself and the incident protection of the rest of the fleet as the source of their coal supply ; " and that she could not participate in prize money awarded under section 4632.

By the fifth clause of section 4631, which treats of the distribution of prize money, after certain deductions, the remainder is to be distributed " among all others doing duty on board, including the fleet captain, and borne upon the books of the ship, in proportion to their respective rates of pay in the service ; " and under section 1569 the pay to petty officers, seamen and others must be fixed by the President. The Court of Claims further decided that as intervenors were shipped and not enlisted, and their pay had not been fixed by the President, but was a matter of agreement with the officer who shipped them, this furnished an additional reason for holding that they were not entitled to share in the prize money.

It is agreed that the decision as to the Nanshan determines the case of the Zafiro.

The District Court adjudged " that the Nanshan and Zafiro, not participating in any of said captures and not being armed vessels of the United States within signal distance of the vessel or vessels making the capture, under such circumstances and in

such conditions as to be able to render effective aid, if required, are not entitled to share in any of the prize property."

Notwithstanding the ingenious argument on behalf of the intervenors, we are not able to arrive at any different conclusion, and to hold that the Nanshan and Zafiro were part of the fighting force of the Navy in the battle, or present under such circumstances and in such condition as to be able to render effective aid in that engagement, as prescribed by the statute. They participated neither actually nor constructively in the captures.

The rights to share of the commissioned officers and enlisted men of the United States Navy on board these two vessels depend on other considerations.

*The decree of the Supreme Court of the District of Columbia on the intervening libel is affirmed.. The decree on the libel is reversed and the cause remanded with directions to enter a decree in accordance with this opinion.*

